# THE STATE ex rel. FRANK W. McALLISTER, Attorney-General, v. CUPPLES STATION LIGHT, HEAT & POWER COMPANY.

### In Banc, June 19, 1920.

1. **OVERHEAD WIRES: Right to Construct.** Ordinance 18680, commonly known as the Keyes Ordinance, and the permits issued in pursuance thereof, gave to the Cupples Station Light, Heat & Power Company the right to construct and operate its overhead electric wires in the overhead district, and did not limit its rights to underground transmission. The acceptance of the terms of said ordinance authorized said company to operate (a) underground transmission of electricity throughout the City of St. Louis and (b) overhead transmission in the overhead district.

2. ———: ———: **Ambiguous Ordinance: Administrative Construction.** The uniform interpretation placed upon an ambiguous ordinance relating to the overhead and underground transmission of electricity, enacted in 1896, when the business of furnishing it to the public for light, heat and power purposes was in its infancy, down to 1914, by the administrative officers of the city and State, whose official duties required them to act under it and carry its provision into effect, namely, that the ordinance authorized the proper board, after a designated period of ninety days, to grant permits to one of the companies which had complied with the ordinance terms, to occupy unassigned streets in either the underground district or the overhead district, is entitled to great weight.

3. ———: ———: ———: **Monopoly: Confiscation: Quo Warranto: To Serve Private Ends.** And where for eighteen years the administrative officers have interpreted the ordinance to authorize the corporation to maintain its overhead wires, it has invested many thousands of dollars in maintaining them, no substantial injury to the public has resulted, a suit in *quo warranto* to oust it of its franchises is inspired by a competing company, and a writ of ouster would promote a private monopoly in such competitor, the writ will be denied.

4. **PRIVATE MONOPOLY: Obnoxious.** Private monopolies are hateful to the law, and it is against public policy to encourage them.

5. **QUO WARRANTO: Discretion.** In this State the discretion of the court in *quo warranto* is not exercised until final hearing

6. ———: **Public Good.** The public good is the element chiefly to be considered in *quo warranto*, and the court exercises a sound discretion on final hearing in deciding whether the writ of ouster shall go.

7. **UNDERGROUND WIRES.** Likewise did the ordinance of St. Louis give to said Cupples Station Light, Heat & Power Company the right to operate in the underground district and to operate underground in the overhead district.

8. **FRANCHISES: Non-user.** Forfeiture of corporate rights for non-user of a permit to establish and operate electric wires for the transmission of electricity for public use cannot be based on the fact that the grantee served only the tenants and occupants of a group of thirty or more large buildings owned by the grantee's stockholders and a few other wholesale houses in a few blocks. It is the right of the public to use and demand the service, rather than the extent of its business, that is the important element in non-user. Because a franchise holder did not operate in all districts in which it was authorized to operate, it did not thereby lose its right to operate in such unoccupied territory.

9. ———: **Abandonment: Laches.** Where the respondent filed its statement with the city that it would not thereafter pay the taxes exacted by the ordinances, because from that date it would permit a certain university to use its wires and conduits, free of charge, but afterwards, by consent of the city, paid all such back taxes, and resumed the use of its franchises and paid its taxes regularly for more than ten years, it did not abandon its franchises, and they cannot be forfeited for non-user, but the doctrine of laches applies.

10. **QUO WARRANTO: Attorney-General: Of Private Benefit.** Where the question is whether respondent is exercising a public franchise which the public has not granted to it, and is thereby trespassing upon the right of the public, the Attorney-General has the right to institute and maintain *quo warranto* to oust it from its unlawful usurpations, even though respondent's competitors will reap private gain if the writ goes, and it is the right of any citizen, regardless of motives, to bring to his attention a violation of a public right.

11. ———: ———: **Public Interest: Private Gain.** A suit of *quo warranto* to oust a corporation from the exercise of usurped franchises is instituted in behalf of the public for the public's benefit, and it is not immaterial what private zeal inspired official action; but in cases where a municipality is peculiarly interested and the suit is based upon a violation of its ordinances, but it has repeatedly refused to litigate a supposed infringement upon its rights, and it is a matter of grave doubt whether the interest of the public

State ex rel. v. Cupples Station L. H. & P. Co.

would not be best subserved by a policy of non-interference, the courts may properly take notice of the motives inspiring the private citizen whose insistence sets the machinery of the State in motion

*Quo Warranto.*

WRIT DENIED.

*Frank W. McAllister,* Attorney-General, *S. P. Howell,* Assistant Attorney-General, and *Leahy & Saunders,* of counsel, for relator.

(1) The streets of St. Louis are dedicated to public uses only, and they are held by that municipality in trust for such uses. State ex rel. Underground Service Co. v. Murphy, 134 Mo. 564; Glasgow v. St. Louis, 87 Mo. 682. (2) The laws under which respondent is and was incorporated conditioned its right to lay conductors for conveying electricity through the streets, lanes, alleys and squares of any city (including St. Louis) upon the consent of such city. State ex inf. v. Light & Power Co., 246 Mo. 666; R. S. 1909, ch. 33, art. 7, sec. 3367; Joyce on Franchises, sec. 6; People ex rel. v. Tax Commrs., 174 N. Y. 435, 199 U. S. 38; State v. Topeka Water Co., 61 Kan. 558. (3) This consent by the city can be expressed only by ordinance duly exacted by its legislative body. State ex inf. Jones v. Light & Power Co., 246 Mo. 667. (4) Franchise privileges to be exercised by respondent upon the streets of St. Louis will not be presumed to be granted as against public rights unless conferred in plain and explicit terms; nothing passes by implication. And the Keyes ordinance confers no privileges outside of the underground district, nor within said territory, not applied for in the manner and within the time, therein specified clearly, in connection with the previously enacted ordinances of said city. State ex rel. Laclede Gas. Co. v. Murphy, 130 Mo. 24; Blair v. Chicago, 201 U. S. 463; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 824; Joyce on Franchises (1 Ed.), sec. 254, p. 391; 4

Thomp. Corp. (1 Ed.) sec. 5345; 7 Thomp. Corp. (1 Ed.) sec. 8298. (5) By reason of respondent's failure to render service to the public from the time of its pretended acceptance of the Keyes Ordinance in 1896, until about the year 1913, no grant of franchise privileges which said ordinance might have operated to confer ever became effective; any rights which respondent might have acquired thereunder were voluntarily disused and abandoned, entitling the public to an order of ouster as for disaffirmance, non-user and usurpation. State ex inf. Jones v. Light & Dev. Co., 246 Mo. 640; State ex inf. Jones v. Light & Power Co., 246 Mo. 673; People v. Bank of Hudson, 6 Cow. (N. Y.) 219; State v. Seneca Bank, 5 Ohio St. 175; People v. Northern R. Co., 53 Barb. (N. Y.) 121. (6) Official action of state or municipal officers who had no authority in the matter of granting franchises, cannot be invoked as against the public's right of ouster. State ex inf. Jones v. L & P. Co., 246 Mo. 645, 667; State ex rel. Kansas City v. Ry. Co., 140 Mo. 558; People v. Phoenix Bank, 24 Wend. 433; Wright v. City of Doniphan, 169 Mo. 613; Elliott on Roads and Streets (2 Ed.), sec. 884; McCarter v. Light & Power Co., 72 N. J. Eq. 767. (7) And the principles of estoppel do not apply as against the public to reclaim a license or other special privileges, as distinguished from the franchise to exist as a corporation. State ex rel. v. Lincoln Trust Co., 144 Mo. 576; People v. Pullman Car Co., 175 Ill. 160; 4 Thomp. Corp. (1 Ed.) sec. 5338; Joyce on Franchises, sec. 6; People ex rel. v. Tax Commrs., 174 N. Y. 435, 199 U. S. 1, 150 L. Ed. 75. (8) The city had no authority to grant its streets for a private use, and private gain alone. St. Louis Ry. Co. v. Southern Ry. Co., 105 Mo. 580; State ex rel. Underground Service Co. v. Murphy, 134 Mo. 563; State ex rel. Kansas City v. East Fifth Street Ry., 140 Mo. 556. (9) The condition of the alleged grant being rendition of service to the general public, a refusal to render such service from 1901 to 1907, and only an incidental and slight service to the general public during all other times from 1896 to 1913, was not a sub-

stantial compliance with the franchise claimed to have been conferred: 'and unless there was substantial compliance respondent failed to carry out and use the alleged franchise in a matter of the essence of the contract. Beach on Private Corporations (2 Ed.), sec. 1294; Morawetz on Private Corporations (2 Ed.), sec. 1018; State ex rel. v. Wood, 13 Mo. App. 143, 84 Mo. 381; Harris v. Railroad Co., 51 Miss. 602; State ex rel. Kansas City v. Railway Co., 140 Mo. 554.

*I. R. Kelso* and *C. W. Bates* for respondent.

(1) Respondent predicates its rights upon Ordinance No. 12723, and its amendments, including Ordinance No. 16894, approved October 26, 1892, and Ordinance No. 18680, approved September 8, 1896, known as the Keyes Ordinance. Frolichstein v. Cupples Station L., H. & P. Co., 210 S. W. 90. (2) Respondent complied with all the requirements of amendatory Ordinance No. 18680, known as the Keyes Ordinance, and in pursuance of the terms and provisions of said amendatory ordinance, amending Ordinance No. 12723, filed acceptances and bonds, and fully complied with all the requirements of said Ordinance No. 12723. Frolichstein v. Cupples Station L., H. & P. Co., 210 S. W. 90. (3) Respondent affirmatively contends that it has the lawful right, under the laws and the ordinances and particularly Ordinance numbered 12723, and its amendments, including the Keyes Ordinance, to engage in public service electric business in the city, and use its streets and highways for that purpose, and that it has complied with all the provisions and conditions of said ordinances, entitling it to construct the works which it has constructed, and which it proposes to construct, and to conduct the business which it has been conducting and which it proposes to conduct in the future. (4) The filing of acceptances and bonds by the respondent, under the provisions of Ordinance No. 12723, as amended by Ordinance 18680, conpleted the contract between respondent and the city. State ex rel. Subway Company v. St.

Louis, 145 Mo. 590; St. Louis v. Western Union Tel. Co., 148 U. S. 102; State ex rel. v. Ry. Co., 140 Mo. 539; State v. Miller, 66 Mo. 328; City of Minn. v. Ry. Co., 215 U. S. 417. (a) There is no legal requirement that respondent should occupy any particular length of streets or highways, or serve any particular portion of the public in order to be a public utility. Wiggins Ferry Company case, 208 Mo. 641. (b) When the respondent company complied with the law and ordinances within the time fixed, "all the franchises or privileges conferred by the ordinance attached to be exercised·when the exigency of the business appeared to demand such exercise." Ransome v. Ry. Co., 104 Mo. 380. (5) As bearing upon the construction of these ordinance provisions, we call attention to the following suggestions in the light of which we believe said provisions should be construed: (a) After the adoption of an amendatory ordinance, the amendment forms part of the ordinance amended, and the two form one complete ordinance, and must be read as one in its application to future transactions. (b) In construing an ordinance or statute, if of doubtful meaning, the Court will consider, among other things, the whole and every part thereof, taken and compared together, including the title; also ordinances or statutes in pari materiae and prior ordinances or statutes. Dart v. Bagley, 110 Mo. 53; Sedalia v. Smith, 206 Mo. 364. (c) In construing an ordinance granting the use of streets for public purposes, a fair and reasonable meaning should be accorded, giving full effect to all the language, discarding none of it as meaningless. Ransome v. Ry. Co., 104 Mo. 380. (d) In construing an act granting the right to construct a bridge for public purposes, over a navigable stream, courts must look to its spirit and reason and purpose. Missouri River Packet Co. v. Ry. Co., 79 Mo. 492; (e) Acts granting franchise rights in streets should be so construed as to prevent monopolies. State ex rel. Laclede Gas Light Co. v. Murphy, 130 Mo. 26. (6) The practical construction of statutes and ordinances by the departments and officials charged with

the duty of acting under them, is of great persuasive force and efficacy. Sedalia v. Smith, 206 Mo. 364; Construction Co. v. Ice Rink Co., 242 Mo. 262; State ex rel. v. Railroad, 135 Mo. 648; Orthwein v. St. Louis, 265 Mo. 577; Ross v. Railroad, 111 Mo. 25; State ex rel. v. Sevrance, 49 Mo. 404; Ewing v. Vernon Co., 216 Mo. 689; State v. Gordon, 266 Mo. 412; Folk v. St. Louis, 250 Mo. 141; Smoot v. Bankers' Life Assn., 138 Mo. App. 466; Bloxan v. Electric Light & St. Ry. Co., 36 Fla. 519, 29 L. R. A. 509; United States v. Hammers, 221 U. S. 228; Laroque v. United States, 239 U. S. 64; Kindred v. Union Pac. Railroad, 225 U. S. 596; Logan v. Davis, 233 U. S. 627; United States v. Finnell, 185 U. S. 244; Bank v. United States, 206 Fed. 374; Ah Kow v. Neuman, 5 Sawyer (U. S.), 560; Smith v. Bryan, 100 Va. 204; Daniel v. Simms, 49 W. Va. 566. (7) Furnishing electricity to the public or such of the public as is reached by transmission lines is a public service. State ex rel. v. Allen, 178 Mo. 577. Neither the amount of business done, nor the number of persons who have occasion to use the service determines the question whether the business is a public service business. Kettle River Co. v. Eastern R. Co., 6 L. R. A. 117; Bridal Veil Lumbering Co. v. Johnson, 34 L. R. A. 369. The uses for which a utility was desired are not the less public because the motive which dictated the location of its works at the particular place was to reach a private industry or because the proprietor of that industry contributed in any way to the cost. Ry. Co. v. Northwestern Co., 161 Mo. 308; Dietrich v. Murdock, 42 Mo. 284; Hairston v. Ry. Co., 208 U. S. 608; Union Lime Co. v. Ry. Co., 233 U. S. 222; Tap Line Cases, 234 U. S. 25. A public service corporation serves the public although the service rendered be limited in locality and by its capacity to serve. It is immaterial who owns the stock in the corporation or that none others are served. Ry. Co. v. Northwestern Co., 161 Mo. 308; Dietrich v. Murdock, 42 Mo. 284; United States v. Union Stock Yards, 226 U. S. 286; Tap Line Cases, 234 U. S. 1; Union Stock Yards v. United States, 169

Fed., 404; Rockingham County Co. v. Hobbs, 72 N. H. 531, 66 L. R. A. 585; Deerfield River Co. v. Wilmington Co., 83 Vt. 553; Jacobs v. Water Supply Co., 220 Pa. St. 394; Talbot v. Hudson, 16 Gray, 425; P. W. W. Co. v. Bird, 130 N. Y. 259; Williams v. School District, 33 Vt. 279; Ulmer v. Railroad Co., 98 Me. 599; Jeter v. Vinton, Co., 114 Va. 779; State ex rel. v. Sup. Ct., 56 Wash. 217. The statute under which respondent was incorporated expressly provides that any corporation formed under its provisions for the purpose of supplying any town, city or village with, among other things, electricity, shall with the consent of the city, etc., have full power to manufacture, sell and furnish such quantities as may be required in the city, town or village, district or neighborhood where located. R. S. 1909, sec. 3367. (8) That respondent never abandoned its franchise is shown by the uncontradicted evidence in this case. It always complied with the regulations and exactions of the city, its administrative boards and officers, and of the State, and its administrative officers and boards. There is no evidence in this case of non-user. Non-user alone, unless of entire franchise and so long continued as to evidence an intention to abandon, cannot constitute abandonment. State ex rel. v. Societe, 9 Mo. App. 120; Wright v. El. Ry. & Lt. Co. 36 L. R. A. 50; Illinois Trust Co. v. Doud, 105 Fed. 129; Raritan W. P. Co. v. Veghte, 21 N. J. Eq. 462. Mere failure on the part of the corporation to take advantage of authority to enlarge its works is not an abandonment. Water Power Co. v. Veghte, 21 N. J. Eq. 480; State v. Water Co., 98 Me. 232. Even if the letter, stating that only Washington University tenants would be served amounted to an agreement, which it did not, to abandon public service, it was simply void, but no ground for forfeiture. Central Trans. Co. v. Pullman Car Co., 139 U. S. 53; Thomas v. Railroad Co., 101 U. S. 81; Gibbs v. Baltimore Gas. Co., 130 U. S. 410; Seasongood Co. v. Tennessee Co., 49 L. R. A. 271. An implied surrender of a franchise is not sufficient. To be effective it must be explicit. State v.

Real Estate Bank, 5 Ark. 606. (9) Failure of a public service corporation to perform obligations to individuals or other corporations is not ground of forfeiture. State ex rel. v. Ry. & Bridge Co., 91 Iowa, 526; State v. Thresher Mfg. Co., 40 Minn. 225; People v. Lake St. Elev. Railroad, 54 Ill. App. 362; 2 Spelling on Injunctions and Other Extraordinary Remedies (2 Ed.), secs. 1829, 1830. Refusal of service to individual consumers furnishes no basis for complaint when just as good service can be procured from other sources. Weld v. Gas & Elec. Light Commrs., 197 Mass. 559. Not every violation of duty is ground for forfeiture of franchises. State ex rel. v. Natl. School of Osteopathy, 76 Mo. App. 444; State ex inf. v. Delmar Jockey Club, 200 Mo. 51; State ex rel. v. Societe Republicaine, 9 Mo. App. 119; State ex rel. v. Lincoln Trust Co., 144 Mo. 562; State v. Farmers' College, 32 Ohio St. 489; Illinois Bank v. Doud, 105 Fed. 128; State ex rel. Ellis v. Tampa Waterworks Co., 57 Fla. 533, 22 L. R. A. (N. S.) 683; State ex rel. v. Ry. Bridge Co., 91 Iowa, 517, 528. (10) Where no public interest will be served by the ouster courts will refuse to declare forfeiture of franchises. State ex inf. v. Ry. Co., 176 Mo. 70; State ex rel. v. Men's Club, 178 Mo. App. 562; State v. Lindell Ry. Co., 151 Mo. 179; State ex rel v. Ry. & Bridge Co., 91 Iowa, 526, 532; Harris v. Ry. Co., 51 Miss. 605; State v. Thresher Mfg. Co., 40 Minn. 225; Commonwealth v. Monongahela Bridge Co., 216 Pa. St. 108, 8 Ann. Cas. 1076; State v. Building Assn., 35 Ohio St. 264; State ex rel. v. People's Assn., 42 Ohio St. 584; State v. U. S. Trust Co., 140 Ala. 610; 103 Am. St. 63; State v. Water Co., 98 Me. 232; State ex rel. Howard v. Crawfordsville T. P. Co., 102 Ind. 289; State v. Essex Bank, 8 Vt. 491; In re Equity Gas Light Co., 10 N. Y. Supp. 801; People v. Lake Street Elev. Ry. Co., 54 Ill. App. 256. (11) Short of abandonment of all service, the remedy for violation of duty is not forfeiture but compelling of performance. State ex inf. v. Lincoln Trust Co., 144 Mo. 599. The law furnishes ample remedies other than forfeiture for refusal of public service corporation to render all the services

it ought to render, such as indictment, mandamus, injunction and damages. State ex rel. v. Railroad Co., 262 Mo. 720; State ex rel. v. Kinloch Tel. Co., 93 Mo. App. 349; State ex rel. v. Joplin Water Works, 52 Mo. App. 314; Rex. v. Ivens, 7 C. & P. 221; Northern Pacific R. R. Co. v. Dustin, 142 U. S. 499; Great Western Ry. Co. v. Queen, 1 El. & B. 878; Union Pacific R. R. Co. v. Hall, 91 U. S. 343; Peek v. Ry. Co., 10 H. L. Cas. 493; Wheeler v. San Francisco Ry. Co., 31 Cal. 46; Southern Exp. Co. v. R. M. Rose Co., 124 Ga. 581 5 L. R. A. (N. S.) 623; Bennett v. Dutton, 10 N. H. 483; Seasongood Co. v. Tennessee Co., 49 L. R. A. 270; McEntee v. Kingston Water Co., 165 N. Y. 33; Railroad v. Olanta Coal Co., 158 Fed. 41; Royal Co. v. Ry. Co., 217 Fed. 148; Crescent Liquor Co. v. Platt, 148 Fed. 903; State ex rel. Ellis v. Tampa Water Works Co., 57 Fla. 453, 22 L. R. A. (N. S.) 682; Doty v. Strong, 40 Am. Dec. 773; Sanford v. Catawissa Railroad, 64 Am. Dec. 667; Williams v. Mut. Gas. Co., 52 Mich. 499; Shepard v. Gas Light Co., 6 Wis. 539. (12) The State is barred by laches or by waiver from investigating matters occurring five, eight, ten or more years prior to the bringing of this *quo warranto* proceeding, and the State is estopped by its acquiescence and acts on the part of respondent in reliance upon rights in good faith claimed by it with the acquiescence of the public officials and by the expenditure of large sums of money. State ex inf. v. Lumber Co., 260 Mo. 284; Simpson v. Stoddard Co., 173 Mo. 463; State ex rel. v. Town of Westport, 116 Mo. 595; Town of Montevallo v. School District, 268 Mo. 224; State ex rel. v. Town of Mansfield, 99 Mo. App. 153; State ex rel. v. Huff, 105 Mo. App. 364; St. Joseph v. Railroad, 268 Mo. 55; State ex inf. v. Delmar Jockey Club, 200 Mo. 52; State v. Bailey, 19 Ind. 453; Platt v. Oakland Co. Bank, 1 Doug. (Mich.) 282; Iowa v. Carr, 191 Fed. 257; Santa Rosa Railroad v. Central Street Railroad, 38 Pac. 990; State ex rel. v. Janesville Water Co., 32 L. R. A. 391, 92 Wis. 496; State ex rel. v. Lincoln Street Ry. Co., 80 Nebr. 333; Commonwealth ex rel. v. Bala

T. P. Co., 153 Pa. 47; High on Extraordinary Remedies, sec. 621; State ex inf. v. Light & Power Co., 246 Mo. 668; State ex inf. v. Light & Dev. Co., 246 Mo. 651. The expenditure of money in good faith and the exercise of rights under a franchise are recognized in all the cases as persuasive elements to be considered by the court in cases involving forfeiture of franchises. State ex inf. v. Light & Dev. Co., 246 Mo. 651; State ex rel. Subway Co. v. St. Louis, 145 Mo. 590; People v. Lake St. Railroad, 54 Ill. App. 348; Kavanaugh v. St. Louis, 220 Mo. 517; Heard v. Talbot, 7 Gray, 119; In re Equity Gas Light Co., 10 N. Y. Supp. 802; State ex rel. Howard v. Crawfordsville T. P. Co., 102 Ind. 289; Illinois Bank v. Doud, 102 Fed. 123. Where it appears that the proceedings in *quo warranto* is a contention between private parties, involving private rights, as contradistinguished from public, the proceeding should be quashed. (13) Non-user, although serious enough to furnish the basis for a forfeiture, is not in itself a forfeiture, and the right to exercise the franchise remains until taken away by judicial action in *quo warranto* proceedings. State ex inf. v. Ry. Co., 176 Mo. 707; State ex rel. Business Men's Club, 178 Mo. App. 567; People v. Drainage Commrs., 31 Ill. App. 223; State ex rel. v. Wood, 13 Mo. App. 144; State ex rel. v. Boonville Bridge Co., 206 Mo. 74.

WILLIAMSON, J.—This is a proceeding by *quo warranto*, in which the State, at the relation of the Attorney-General, seeks to have this court determine by what authority the respondent claims to have the right to occupy certain of the public ways of the City of St. Louis in the prosecution of its business of furnishing the public with electric light, heat and power. Upon the filing of the petition, an order to show cause was duly issued and respondent made its return thereto, making certain issues of law and of fact. Thereupon, Hon. Charles G. Revelle was appointed a commissioner to hear the evidence and report upon the facts and the law involved. Much evidence was heard and the com-

missioner has filed his' report, to which both parties have filed numerous exceptions. The cause is now submitted for judgment.

The petition, after proper formal allegations, in substance avers that by ordinances duly enacted, the City of St. Louis has provided that the right to use the public ways of that city in the business in which respondent is engaged, shall be granted only by ordinances duly enacted by the lawfully constituted authorities of that city, and that any corporation to which such rights shall be so granted shall also procure a permit from the Board of Public Service of St. Louis, authorizing it to use the public ways of the city in its business; that no such right has been granted to respondent as by law required, but that respondent, nevertheless, has been granted a permit by the Board of Public Service so to use said ways of said city; that by Ordinance No. 18680, duly adopted by the City of St. Louis, the placing of means of conveying electricity above ground within certain designated portions of said city was prohibited after December 31, 1898; that it was further provided by said Ordinance No. 18680 that any corporation which was at the date of the adoption of said ordinance, to-wit, September 8, 1896, or which within ninety days thereafter should be authorized to transmit electricity for public use, and which desired to place tubes, wires, conduits or cables under the surface of the public ways of said city, would be authorized so to do after receiving a permit therefor from the Board of Public Service aforesaid, and by said Ordinance 18680 said board was directed to fix a day, not more than ninety days after the adoption of said ordinance, upon which any corporation desiring such permit should apply therefor to said board, in writing, specifying "its requirements," and providing that a failure so to apply should operate to exclude such corporation so in default from obtaining "conduit facilities" in the streets in said territory, and providing further that said board should issue such permits to corporations duly applying therefor upon the filing with the City Register of said city of

bonds conditioned as by said ordinance required, and an acceptance of the provisions of said Ordinance No. 18680; that respondent filed the required bonds and acceptance; that there was then in force in said city an ordinance providing for the filing by such corporation, on certain named dates, of a statement of gross receipts and the payment of a five per centum tax thereon; that compliance with said ordinance was one of the conditions of the bonds and acceptance required as above set out; that respondent duly filed said statements until January 1, 1901, but rendered no public service; that on February 8, 1901, respondent notified the comptroller of said city that it would file such statements and pay such tax no more, and that it would thenceforth permit "Washington University [an incorporated educational institution] to use its conduits free of charge to supply electric light and power to the tenants of Washington University only." Relator avers that respondent has by these acts forfeited its franchise, if any it had, and prays a judgment of ouster against it.

In its return respondent alleges that it is lawfully exercising its franchises and powers granted by its articles of incorporation under the provisions of ordinances of the City of St. Louis numbered as follows, to-wit: Ordinance No. 12723, approved March 15th, 1884; Ordinance No. 16894, approved October 26th, 1892, and Ordinance No. 18680, known as the "Keyes Ordinance," approved September 8, 1896, and various amendments thereto, all of which, so far as may be necessary, will be discussed later. It then avers that before the expiration of the ninety-day period after the passage of Ordinance No. 18680, it was duly authorized "to operate wires, tubes and cables conducting, transmitting and employing electricity for public use, and that it did, on or about the 4th day of December, 1896, file with the City Register its written acceptance" as in said ordinance provided, and gave the bonds therein required, and then avers that "respondent has reported its gross receipts to the Comptroller of the

City of St. Louis from 1897 down to the present time and has paid to the city five per cent of its said gross receipts from that time. to the present time;'' that within the ninety-day period allowed for that purpose by Ordinance No. 18680 it applied to the proper board for a permit as by said ordinance required, and duly received such permit, and since that time it has received various similar permits from the proper authorities of said city, and in accordance with the rights and powers thus obtained, it has installed and operated and is now operating appliances for ''transmitting electricity for public use in the City of St. Louis,'' and that at the time of the institution of these proceedings it had in the underground district more than thirty miles of conduits, and in the overhead district more than thirty-one miles of overhead wires, and was using both for the public service; and that these conduits and wires had been installed under the various ordinances and permits above mentioned, prior to the filing of this proceeding. Respondent then sets out the amount of taxes paid by it to the city and State, aggregating several thousands of dollars, and alleges that it has been continuously in business from the date when it first qualified as above set forth; that it has been recognized by the State Public Service Commission, by the courts of the State and by various authorities of the City of St. Louis as a duly qualified electric light and power company; that by competition it has forced better service and cheaper rates in said city; that, the premises considered, its franchise rights ought not now to be questioned; that no public interest is affected by the grounds alleged by petitioner; that respondent's rights are attacked by a private competitor under the name of the State, and that to oust respondent, as prayed in the information, would be detrimental to the public welfare. Various other matters are alleged or denied, and these allegations and denials will be noted hereafter, if necessary. Relator thereupon filed a reply, which consisted largely of denials, but contained some affirmative allegations, which, so far as necessary, will be specified later.

Upon these issues the evidence, reported in several bulky volumes, was heard, and upon this evidence and the law applicable thereto, as he conceives it, the learned commissioner has filed a report. He has well stated the facts as follows:

"On November 21, 1896, the respondent company was organized and duly incorporated for the purposes and with the charter powers stated in the information, and such purposes and powers embrace all the acts which the respondent is performing and proposes to perform, and authority for which is challenged by this proceeding. Its capital stock was originally $5,000 and so continued until March 17, 1913, at which time it was increased to $1,000,000.

"At the time of and for some years prior to respondent's incorporation, Robert S. Brookings and Samuel Cupples were owners and proprietors, either in their individual names or the names of corporations whose stock they owned, of large and extensive properties and buildings, about thirty-five in number, occupied, in part, by said Brookings and Cupples for the manufacture, storage and sale of woodenware products. A part of these properties were occupied by other persons as tenants who were engaged in various lines of business, chiefly wholesale dealers, numbering about thirty-two, and such properties became generally known as the 'Cupples Properties.' They were located in that part of the city extending from Sixth to Eleventh streets and from Poplar to Clark.

"Prior to respondent's incorporation, these properties and the occupants thereof, including Brookings-Cupples and their tenants, were furnished with electricity from a rather small plant that had been installed by said Brookings and Cupples. Upon the organization and incorporation of respondent, it took over and began operation of this electrical plant. The said owners of said Cupples properties, who were likewise the incorporators and owners of the capital stock of the respondent, then placed in

their contracts of lease and occupancy with their tenants, a clause requiring such tenants to purchase and obtain their electrical current from the respondent, and its said plant, provided the rates made by respondent were as low and the service rendered was as good as could be obtained from other concerns furnishing similar facilities and supplies. The electrical power furnished such tenants was not included in the rental of the property, but was sold and billed directly to the tenants. From the day of its incorporation until the time that its stock was acquired by the Light & Development Company, it served no electrical current and rendered no service to any person or concerns except the tenants and occupants of the group of buildings above mentioned and except in perhaps two or three other isolated cases. Its plant, during these years, was just about adequate to serve the class and persons above stated, and during that time it made no effort to extend its activities, and, in a few cases, declined to serve persons outside of that class and who applied for service. It was, however, during these years rendering current and other electrical service to all of such tenants and class as would accept same. During the year 1900 this group of buildings which the respondent was serving with electrical current was transferred to Washington University, and at that time the capital stock of the respondent company was likewise transferred to said institution, and in February, 1901, thereafter, the respondent company, through its properly authorized officer, filed with the City Comptroller an instrument in writing, the material part of which is as follows:

" 'From this day the Cupples Station Light, Heat & Power Company will permit the Washington University to use its conduits free of charge, to supply electric light and power to the tenants of Washington University only, and hence this will be the last semiannual statement to be made to your office by this company.'

"This instrument related to the statement and payment of five per cent upon gross earnings which the city ordinance at the time required of all companies engaging

in the electrical business of serving the public. On the back of this instrument was indorsed by some city official the following:

" 'Henceforth not required to make semiannual settlements. See inside.'

"During the years 1901-1902, 1903, 1904, 1905, 1906, no statements of gross earnings were filed and no payment of such taxes was made by respondent, but in the year 1907 it filed an application for a permit to construct an additional conduit on Spruce Street, and was denied, because of instrument above mentioned, and because of respondent's failure during the years stated to file the required statement and to make payment of said five per cent of its gross earnings. Thereupon a conference was held among the representatives of the respondent and the City Counselor and the City Comptroller and the superintendent, and as the result thereof the respondent then filed a statement as to its gross earnings during each of the years that it had failed to make a statement, and then paid to the city, and the city received through its administrative officers, in one aggregate payment, the five per cent on the gross earnings of respondent for each and all of said omitted years, and the permit theretofore applied for was then issued. After filing the above mentioned instrument in February, 1901, and during the years up to 1907, the respondent strictly adhered in practice to its declaration that thereafter only the tenants of Washington University would be served, and expressly declined to serve other persons who did in point of fact, during this time, make application to respondent for service, and even after 1907 and up to 1913 it continued to serve only said class, except in two or three cases.

"The Light & Development Company, which in February, 1908, had been incorporated with a capital stock of $5,000, and which by April, 1913, had been increased to $1,500,000, was a corporation holding the stock of other light and power companies and furnishing to its subsidiary companies various advice and assistance in their management and operations and for which service it re-

ceived certain fees and compensation. On March 1, 1912, said Light & Development Company acquired all the stock of the respondent company, and on April 14, 1913, transferred said stock to the United States Public Service Company, a holding Delaware corporation with an authorized capital of $10,000,000. When the stock of the respondent company was transferred by Washington University to the Light & Development Company, it received in payment thereof certain shares of the capital stock of said Light & Development Company. About this time the former officers of the respondent company resigned, and some of those interested in the Light & Development Company were elected as its officers and directors. All of these gentlemen were practical electrical, mechanical or civil engineers and operators of various years of experience. It was after these transfers of the capital stock of the respondent that it began to enlarge its activities and to seek and serve patrons outside of the class and group of tenants heretofore referred to. Its efforts to thus enter new fields were constantly challenged and resisted by its principal competitor, the North American Company, and its subsidiaries. Its rights to permits in both the underground and overhead districts were challenged before the Board of Public Improvements, as were also its efforts to obtain authorization from the Public Service Commission of the State. Its alleged rights to operate in the overhead district were also challenged by the suit of Frolichstein against said company, filed August 8, 1914. The Board of Public Improvements, as well as the Public Service Commission of the State, ruled in favor of the respondent in these various matters, although, as hereinafter stated, there was some diversity of opinion among the administrative officers with reference to these questions.

"Since 1913, the respondent has been, by various official acts, recognized as a public service company, rendering a public service in the City of St. Louis, by both the Public Service Commision of the State and the City Board of Public Improvements, and official certificates to

render such service have been granted by each of these administrative bodies. There has not, however, been any direct recognition of the respondent as such a public service corporation by the Municipal Assembly or other legislative bodies.

"The respondent has, since 1913, extended its wires, poles, conduits and service to various parts of the city, and its wires and poles now extend over approximately thirty-one miles of the overhead district, and since said time it has also installed and is operating many conduit ducts within the underground district. Since April, 1913, is has expended and invested in its improvements and extensions approximately $636,000, of which $30,318 was spent in the year 1912; $151,256. was expended and invested in 1913; $74,025 in the year 1914; $51,747 during the year 1915; $226,091 during the year 1916; $102,780 during that part of 1917 prior to April 21, 1917, the date of the institution of this suit. It has also, since January 1, 1897, to January, 1912, paid into the city the sum of $6,106.57 taxes upon its gross earnings. From January, 1912, to the date of the institution of this suit, it also paid $17,494.09 taxes upon its gross earnings, making a total of its payment of gross-earnings tax of $23,600.66. It has also paid during the period beginning 1898 and ending 1917, in the way of personal taxes, the aggregate amount of $4,697.08. From 1902, the effective date of the franchise-tax statute, to 1911, inclusive, it paid in the way of a franchise tax the sum of $1,609.04, and for the year of 1912 and succeeding years it paid a total franchise tax of $6,472.50, making its total payment of franchise taxes during the period of its existence, $4,081.90.

"At the time required by the Keyes ordinance and within ninety days after the passage thereof, the respondent had and possessed a charter authorizing it to operate wires, tubes, cables, etc., for public use, and within the time provided by said ordinance it duly complied with all the formal requirements of the ordinance in the way of qualifying thereunder, by properly executing and filing the various instruments required and by otherwise per-

forming the formal acts necessary for that purpose. Within the appointed time it presented to the Board of Public Improvements its plans and specifications and a written statement of its requirements in the way of underground conduits, ducts and manholes, etc., and the streets it desired at that time to occupy for underground purposes. At the initial meeting of the board, held in pursuance of the ordinance and within ninety days after the approval thereof, the respondent was assigned underground rights in certain streets which its application had designated. This was a general meeting at which rights to occupy numerous streets were assigned to various light and power companies, such streets having been heretofore designated in an advertisement duly made by the board.

"The respondent has procured permits for underground construction and is occupying and proposes to occupy streets with its conduits, ducts, etc., which were not designated or included in its statement and detailed plan filed within ninety days after the approval of the act and which were not considered or authorized at the meeting held within said period of ninety days. The streets which it occupies and proposes to occupy as above found are not streets or constructions named or embraced in the advertisement and notice of said initial meeting of the board, and are not streets or constructions then considered or assigned. [It is such streets whose use and occupancy by respondent are challenged by this suit.]

"Up to August, 1914, the respondent had obtained for underground construction in the overhead district, five permits, being permits: No. 13251, issued Oct. 4, 1912; No. 13534, issued Mar. 4, 1913; No. 13535, issued Mar. 4, 1913; No. 13817, issued June 27, 1913; No. 14404, issued April 8, 1914, and during the same period it received approximately twenty-eight permits to do underground construction in the underground district. It was not until about August, 1914, that respondent made any effort to go into the overhead district with overhead

wires and surface poles, and it was at about that time that it made its application for its first permits for such overhead construction. Its' rights to and authority for such permits were immediately challenged by the institution of the suit of Frolichstein v. respondent, on August 8, 1914, and from and after said date all permits issued to respondent in the overhead district contained a clause reciting that the same were issued subject to the decision to be rendered in that case. All the permits set out in the respondent's exhibit, filed with its return, in both the overhead and underground districts, were duly issued in the manner and at the time stated in said exhibit, and in addition thereto approximately eighteen others have been issued.

"Had such evidence not been excluded upon the ground that it was incompetent and immaterial, the respondent would have established, in point of fact, that in 1916, Mr. J. S. Leahy requested the Circuit Attorney of the City of St. Louis to institute *quo warranto* proceedings against this respondent to have its alleged franchise forfeited, and that after investigation, the Circuit Attorney declined to do so, and that at a later date and after the election of Circuit Attorney McDaniels, a similar request was made of him; that in March, 1917, Attorney-General McAllister stated to Circuit Attorney McDaniels that he had been requested by Mr. Leahy to institute *quo warranto* proceedings against the respondent and inquired as to whether the Circuit Attorney would waive his right to sue and allow the Attorney-General to proceed directly in this court, to which the Circuit Attorney replied that the Attorney-General clearly had the right to proceed without any waiver on his part, and that it was entirely satisfactory to him for the Attorney-General to so proceed; that some days later and after another visit by Mr. Leahy to the Circuit Attorney, the Circuit Attorney wrote a letter to Mr. Leahy in which he stated that he had given consideration to the suggestion made to him that he proceed against the respondent, but inasmuch as arrangements had already been made for the

institution of a suit by the Attorney-General, there was nothing further on his part to do, and that he had no objections to the institution of the suit in the Supreme Court by the Attorney-General. That, thereafter, Mr. Leahy and other attorneys of the Union Electric Light & Power Company prepared an information which is substantially the one upon which this suit is predicated and submitted same to the Attorney-General, who referred it to his assistant, General Howell; that the information thus prepared was somewhat modified and thereupon filed; that during the various stages of the proceedings, both before the court and the commissioner, Mr. Leahy had participated and that he was employed for such purpose by the Union Electric Light & Power Company, a subsidiary of the North American Company. General Howell was also in attendance at the hearings before the commissioner a greater portion of the time, and he and counsel employed by the North American jointly had represented the relator in this case.''

We will discuss respondent's rights in the following order: first, its right to operate overhead in the overhead district; second, its right to operate underground in the underground district; and, third, its right to operate underground in the overhead district.

As a preliminary to the discussion of these questions, it may be noted that relator has filed a motion to strike out portions of respondent's return. This motion was taken with the case. We think a decision may be reached most satisfactorily by adopting a liberal attitude toward the pleadings, to the end that the decision may turn upon the merits of the case, rather than upon more or less technical rulings on the pleadings. This motion is therefore overruled.

Each party has filed numerous exceptions to the report of the commissioner. Many of these exceptions relate to matters which are of minor importance; many are couched in very general terms, so that to rule thereon would require a vigilant search of the exceedingly voluminous record before us, and the exceptions are so numer-

ous that a ruling on each would expand this opinion to an intolerable length. We will pass, either expressly or by necessary implication, upon all which seem to be of importance, and the remainder may be considered to be overruled.

I. We will now proceed to a consideration of the right of respondent to operate overhead in the overhead district. Much pertinent history of the municipal legislation of the City of St. Louis is set out in the opinion in Frolichstein v. Cupples Station L. H. & P. Co., 210 S. W. 90, in which REYNOLDS, P. J., quotes at length from an opinion by Hon. Eugene McQuillen, before whom that case was tried in the circuit court. Those who desire more specific information than will appear herein, may consult that opinion. We do not consider it necessary to encumber our reports with a duplicate of that statement, nor could we hope to add anything to the thoroughness and accuracy with which these matters were treated by the learned jurist and law-writer who tried the Frolichstein case below, and by our learned brethren of the St. Louis Court of Appeals, before whom that case was heard on appeal.

*Overhead District.*

In view of what is said in the opinion in that case, we think it will not be necessary for us to go further into the past respecting pertinent ordinances of the City of St. Louis than Ordinance No. 18680, commonly called the Keyes Ordinance. This ordinance was adopted September 8, 1896. Within ninety days after that date, respondent had been duly incorporated and was by its charter authorized to engage in the business of producing, transmitting and marketing electric light, heat and power. Within the ninety day period fixed for that purpose by the Keyes ordinance, respondent duly complied with all of the requirements of that ordinance respecting the filing of bonds and an acceptance of the terms of the various ordinances by the Keyes ordinance required to be accepted, and respondent also obtained the

permit required by the Keyes ordinance. What rights were thus acquired by respondent? Respondent contends that it acquired the right to operate both overhead and underground means of transmission, in the proper districts, throughout the city; relator contends that respondent's rights, if any, are limited to underground transmission. The learned commissioner has found in favor of relator's contention as to respondent's right to operate overhead in the overhead district. To this finding respondent has duly excepted. The questions thus presented are not free from difficulty. They involve a construction of the Keyes ordinance, as well as other considerations. The title to the Keyes ordinance is sufficiently broad, we think, to cover matters relating to overhead as well as to underground construction. This title declares the act to be "amendatory" of Ordinances Nos. 17188, 18157 and 18480, and to be intended "to repeal" Section 604 of Article Two, Chapter 15, of the Revised Ordinances of 1893 as amended by Ordinances Nos. 18157, 18480 *"in relation to electric wires, tubes and cables and authorizing the construction of underground conduits,"* etc., and to regulate the terms upon which persons and companies now having contracts with the city for the doing of public electric lighting *may place their wires underground,* and to repeal Ordinance Number 18480. Ordinances Nos. 18157 and 18480 relate to overhead wires in certain districts of St. Louis. Sections 604, 604A, 604B, 604D and other sections of the Keyes Ordinance in express terms relate to wires which are to be placed above the surface of the ground, while Sections 607, 608, 609 and 611 of that ordinance relate to *"poles"* bearing electric light wires. These latter sections, of course, impliedly relate to overhead construction. We think it reasonable to conclude from these and other considerations, more fully set forth in the Frolichstein case, that the Keyes Ordinance was not intended to relate solely to underground construction. This is also the view taken both by the trial court and by the St. Louis Court of Appeals of this

same contention when it arose in the Frolichstein case, supra.

Respondent contends that by its acceptance of the terms of the Keyes Ordinance, it became authorized to operate (a) underground transmission throughout the city, and (b) overhead transmission in the overhead district. In the Frolichstein case both the trial court and the St. Louis Court of Appeals so found. The learned commissioner has held to the contrary, so far as the right of respondent to operate by means of overhead transmission is concerned. After a careful study of these conflicting and ably presented views, however, we think that the conclusion announced by the trial court and adopted by the St. Louis Court of Appeals as a part of its opinion in the Frolichstein case, is correct. That conclusion was as follows:

"In view of the foregoing consideration, my opinion is that the ordinances of the City of St. Louis at present provide for both underground and overhead electric wires.

"The defendant company accepted and qualified under the Keyes Ordinance, and is therefore entitled to all the benefits and privileges conferred by the general ordinances of the city on any person or company who accepted and qualified under their provisions. That is, by accepting and qualifying under the provisions of the Keyes Ordinance, the defendant company in effect thereby accepted and qualified under Ordinance 12,723, as amended after its passage. This, for the reason that the Keyes Ordinance is merely an amendatory ordinance relating to the place and maintenance of wires for the distribution of electricity. It is not limited to legislation respecting conduits and other underground electric work, but was designed to supplement prior legislation on the subject and thus complete and perfect a plan by which both underground and overhead electric wires for the distribution of electricity could be safely placed and used in the city; and the defining of the underground district and providing for the conditions and manner of

locating wires therein was only a part of the general purpose, and not the sole object. The provision therein concerning acceptances related, therefore, to overhead as well as to underground electric wires, and was a privilege extended for the period of ninety days to all persons and corporations which might be authorized to do an electric lighting business in the city.

"Therefore, the defendant company having fully accepted and complied with the provisions of the Keyes Ordinance, is clearly empowered by virtue of the permit duly issued by the Board of Public Improvements to proceed." [Frolichstein v. Cupples Station L., H. & P. Co., 210 S. W. 90, l. c. 96.]

There are other considerations tending to the same result which, we think, are entitled to much weight.

The conclusion which bars respondent from activity in the line of overhead construction in the overhead district of St. Louis is based entirely upon the construction of the various ordinances relating thereto. These ordinances cover a long period of time, beginning when the business of furnishing light, heat and power by electricity was in its infancy, and they exemplify the development of municipal legislation in relation to that business through many years, many enactments and many repeals. As is lamentably frequent, the ordinances in question are often lacking in perspicuity and lend themselves more or less readily to varying constructions. This fact is shown in this record by the opinions of various city counselors of the City of St. Louis who have from time to time been called upon to construe these ordinances upon many of the questions here involved. It is still further emphasized by the introduction in evidence of opinions of various eminent members of the bar of St. Louis who have from time to time been called upon to interpret these same ordinances. These views vary widely. In some instances they support the conclusions reached in the Frolichstein case, and in others they are diametrically opposed to those conclusions. These facts are mentioned in no sense in a spirit of criticism. It will

suffice for our purpose here, to say that this is forceful evidence of the fact that the ordinances here involved are ambiguous and readily lend themselves to varying interpretations.

It is established, we think, that during practically all of the time from the adoption of the Keyes Ordinance and the incorporation of the respondent in 1896, down to the present time, the various officials of the City of St. Louis who are and have been charged with the practical application of these ordinances in the administration of the affairs of the city under them, have recognized respondent and perhaps other corporatons similarly situated, as being legally qualified to obtain permits to operate throughout the city. This is true also of various departments of the State Government, and particularly of the Public Service Commission. This recognition has sometimes been express, and at other times only implied. Of this practical construction of the ordinances in question the City of St. Louis has, so far as we are advised, made no complaint. On at least two occasions, fruitless efforts were made to induce two different circuit attorneys of that city to file proceedings upon the matters here involved. Until this proceeding was filed, no complaint was made in the name of the State, and it is claimed in this instance, and not denied, that the name of the State is used as a cover and vehicle for the activities of a private business corporation engaged in the same business in St. Louis as the respondent; and in active competition with it. Counsel for this competing company have been exceedingly active in this litigation from its inception down to date. Respondent avers with some heat and vehemence that the mainspring of this attack upon it is a desire for private gain, rather than for the public good. These facts, in our judgment, place this case upon a materially different footing from that upon which it might otherwise stand. We will revert to this phase of the case later in this opinion.

Respondent apparently made no attempt to operate by overhead transmission until some time in 1914. As

soon as it undertook to do so, its right was questioned in the Frolichstein case, and during the pendency of that suit, such permits as were issued to it for overhead transmission (and they were numerous) were indorsed with a statement to the effect that the permit was conditioned upon the result of that litigation. That case, as we have seen, terminated favorably to respondent. The issuance of these conditional permits serves rather to emphasize the fact that the administrative construction was favorable to respondent. The indorsement upon the permits above mentioned is conclusive evidence that the city officials knew of the pendency of the Frolichstein suit, and the fact that the permits were nevertheless issued is evidence of a high order that the city officials construed the ordinances as respondent now contends they should be construed, and strengthens the conclusion that that had constantly been the practical contemporaneous construction of them. It also appears that within the ninety-day period allowed for that purpose, some twelve electric light companies qualified under the Keyes Ordinance and obtained permits. All, or practically all, of these companies, save respondent, seem to have been absorbed by respondent's competitor, who is the real relator in this proceeding. The City of St. Louis was divided into two districts; one, the underground district, was a relatively small downtown district; the other, the overhead district, included the remainder of the city. We think, as the commissioner found, that under the Keyes Ordinance the Board of Public Service was authorized to grant permits to occupy unassigned streets in either district, after the expiration of the above-mentioned ninety-day period. This authority it exercised in numerous instances, in behalf of respondent, both in the underground and in the overhead district. It is under the authority of these permits that respondent is now operating. It is a fair inference that numerous permits were also granted to various others of the duly qualified companies in both districts. This power of the board

seems never to have been assailed in any legal proceedings, so far as this record shows, until about 1914. It was then that respondent obtained a permit in the overhead district and the Frolichstein case, supra, was begun. That case was also inspired by the same private business competitor which is the moving cause of this litigation. It thus appears that for a period of about eighteen years, from 1896 to 1914, these various ambiguous ordinances were the subject of much and varying speculation as to their interpretation by the legal profession, both in and out of official position, but it also appears that the contemporaneous, practical, administrative interpretation was substantially uniform.

It must further be conceded that to take the view that respondent is barred from overhead transmission in the overhead district, is to reduce competition to that extend and to tend, to that extent, to promote a monopoly in this line of business in that district. Monopolies are hateful to the law. It is against sound public policy to encourage them. "I hold it to be an incontrovertible proposition of both English and American public law, that all mere monopolies are odious and against common right." [BRADLEY, J., in Butchers' Union Co. v. Crescent City Co., 111 U. S. 761.] This is particularly true when the monopoly is created by the acts of individuals rather than by an act of the State.

It further appears that, upon the faith of this administrative construction, respondent has invested in equipment used in the overhead district about a quarter of a million dollars, that it is serving a very large area in the City of St. Louis, and that this service is, so far as this record reveals, satisfactory to the public. No substantial injury to the public is shown in this case. To oust respondent from this district would result in a practical confiscation of all, or at least of a large part, of this investment. "Courts have a discretion to enter or refuse to enter a judgment of forfeiture accordingly as the public injury appears serious or trival." [Spelling on Extraordinary Remedies (2 Ed.), Vol. 2, p. 1576.]

It is the wise policy of the law to foster legitimate business; to protect legitimate investments, and to impose only such restrictions upon individual or corporate activity as may be thought to be necessary in order to promote the general welfare. The benignant and abiding purpose of the law is to so guide conflicting selfish interests as to work out the common good. What effect, then, should be given under the peculiar facts in this case to the long-continued recognition of respondent's business existence and activity; to the practical construction placed upon the ordinances here involved by the officials of the City of St. Louis, and by certain administrative boards of the State, and to the other facts above set forth? We are not without authority to guide us to a correct answer to this question.

"From Edwards v. Darby, 12 Wheat. 206, 6 L. Ed. 603, to Jacobs v. Prichard, Trustee, 223 U. S. 200, 32 Sup. Ct. 289, 56 L. Ed. 405, it has been the settled law that, when uncertainty or ambiguity, such as we have here, is found in a statute, great weight will be given to the contemporaneous construction by department officials, who were called upon to act under the law and to carry its provisions into effect, especially where such construction has been long continued, as it was in this case for almost 40 years before the petition was filed. United States v. Hill, 120 U. S. 169, 7 Sup. Ct. 510, 30 L. Ed. 627." [National Lead Co. v. United States, 40 Sup. Ct. Rep. 237, l. c. 239.]

This statement of the rule and of the effect of contemporaneous construction was made since this case was orally argued, but it announces no new doctrine. It is but a repetition of what the United States Supreme Court has uniformly declared to be the law.

"The construction given to a statute by those charged with the duty of executing it, is always entitled to the most respectful consideration, and ought not to be overruled without the most cogent reasons." [Swayne, J., in United States v. Moore, 95 U. S. 763.]

"Conceding then that the statute is ambiguous, we must turn as a help to its meaning, indeed in such case, as determining its meaning, to the practice of the officers whose duty it was to construe and administer it. They may have been consulted as to its provisions, may have suggested them, indeed have written them. At any rate their practice, almost coincident with its enactment, and the rights which have been acquired under the practice, make it determinately persuasive." [United States v. Hammers, 221 U. S. 220, l. c. 228.]

See also dissenting opinion of WHITE, J., in United States v. Trans-Missouri Freight Assn., 166 U. S. 370; Heath v. Wallace, 138 U. S. 582; HARLAN, J., in Webster v. Luther, 163 U. S. 342; Edwards' Lessee v. Darby, 12 Wheat. 210; Logan v. Davis, 233 U. S. 613, l. c. 627; La Roque v. United States, 239 U. S. 62, l. c. 64; State ex inf. v. Breuer, 235 Mo. 240, l. c. 248:

This rule is practically universally recognized and is supported both by reason and authority. Of course, if the administrative construction were clearly wrong, we would not hesitate to disregard it. It is in no sense binding upon the courts. In view of the peculiar facts in this case, however, we feel warranted in applying it in this instance. It has always been the practice in this State to issue the writ of *quo warranto* upon the application of the Attorney-General, as a matter of course and without any investigation of the merits of the case (State ex rel. v. St. Louis, etc., Ins. Co., 8 Mo. 330, l. c. 331; State ex rel. v. Stone, 25 Mo. 555), although in many other jurisdictions the court makes an investigation of the facts and *finally exercises its discretion* at the time of the application for the writ. Thereafter, in those jurisdictions, the case proceeds as an ordinary suit at law. In this State, however, the discretion of the court is not exercised until final hearing. This distincton explains the apparent conflict between many cases cited from other jurisdiction and some of our own decisions. But the authorities are practically agreed that either the

issuance of the writ or the entry of a judgment of ouster (depending upon the practice adopted, as above noted) rests in the sound discretion of the court. The nature and history of the writ of *quo warranto* also support this doctrine. [GOODE, J., in State ex rel. v. Town of Mansfield, 99 Mo. App. 146, l. c. 152.]

"That the court may exercise a considerable latitude of discretion both as to whether it will grant a rule upon the defendant to show cause, where the proceeding is instituted in that way, and as to whether there has been sufficient abuse of franchises by a corporation to warrant their forfeiture, there can be no doubt upon the authorities. But so many relations, public and private, are involved in a forfeiture at suit of the State, and each case involves so many considerations peculiar to itself, that no definite general rules can be stated to guide courts and practitioners. It must be borne in mind that specific facts which have been held sufficient to warrant a judgment of forfeiture in one or several adjudged cases may be so modified by extraneous facts in another case as to deprive the former of value as guides to a correct decision. The most important if not the only interest to be served is that of the public. If that is kept constantly in view, but little difficulty should be encountered. Especially do these observations apply in cases where the proceedings are based upon misuser or non-user of franchises. It may be considered well settled that not every misuser which may be detected will justify a forfeiture, but only those which constitute a prejudice to some public interest, or which, being persisted in, will involve the safety, welfare, or security of the community. A distinction is to be taken, however, with respect to the stage of the proceeding. The spirit of a statute authorizing the granting of the remedy at any time upon a 'proper showing made' is held to contemplate the right of the court to deny the writ or rule to show cause, if it shall consider the showing made not to warrant the relief, since the remedy is by no means a matter of absolute right on the

part of the relator.'' [2 Spelling on Extraordinary Remedies (2 Ed.), sec. 1777.]

Since the public good is the element chiefly to be considered, we are persuaded that, under the facts in this case, we ought in the exercise of a sound discretion to decline to oust respondent from the overhead district. We accordingly hold that respondent is legally authorized to operate by overhead transmission in the overhead district in St. Louis, as against any cause assigned in this case, at least, and to that extent we sustain respondent's exceptions to the commissioner's report.

II. Respondent's right to operate in the underground district, and its right to operate underground in the overhead district remain to be determined. These questions are very clearly and satisfactorily discussed in the report of the commissioner, and we adopt his conclusions concerning them as our own. They are as follows:    ,

Underground Operation.

"Ordinance No. 18157, approved July 31, 1895, while not prescribing any specific underground district, had effectively removed the subject of underground wires from the general provisions of Ordinance No. 12723 and amendments, and had lodged the entire subject, both with respect to the placing of such wires and the companies placing same, exclusively in the hands of the Municipal Assembly to be controlled by it by ordinance, either special or general. The effect of this ordinance upon underground rights had been to place the companies which had duly accepted Ordinance No. 12723 upon identically the same basis as companies which had not so accepted, so that at the time the Keyes Ordinance was adopted there was absolutely no ordinance prescribing what companies or persons could place wires below the ground, and there was nothing limiting or defining the eligibility or qualifications of the companies which could apply to or receive specific authority from the Municipal Assembly, to place such underground wires, and there was no ordinance in this respect which it was necessary for the Keyes Ordi-

nance to repeal or amend, the only provision in force being that no company or person could do this except when expressly authorized by the Municipal Assembly to do so.

"The Keyes Ordinance evidently recognizing that this scheme of having the Assembly pass a specific ordinance for every case of underground construction was ill-advised and impractical and that there was a growing necessity for underground construction and transmission, adopted a new plan and prescribed the qualifications of those whom it authorized to operate thereunder. It did this in the following language: 'Any person or persons, or any corporation or association which is now authorized by its charter or which may be authorized by its charter within ninety days after passage of this ordinance to operate wires, etc., for public use, and desiring to place said wires, etc., under the surface in the streets of the City of St. Louis, is thereby authorized, after the expiration of ninety days from the approval of this ordinance to construct underground conduits,' etc.

"Two classes are thus made eligible:

"1. Natural persons possessing no prescribed qualifications other than a desire to operate.

"2. Corporations or associations which then, or which may within ninety days thereafter, possess a charter authorizing them to employ and transmit electricity for public use.

"It is more or less significant that this ordinance uses the terms 'authorized by ordinance to do business in the City of St. Louis.' As heretofore stated these provisions and definitions of companies which were thereby made eligible to do underground work must be construed as they are here found and without having regard to, or being influenced by, other ordinances, since after the enactment of Ordinance No. 18157, supra, there were none relative to this particular subject.

"In accepting the Keyes Ordinance, persons and corporations which had theretofore and within the proper time accepted Ordinance No. 12723, were required to ac-

cept the Keyes and all former ordinances in the same manner and to the same extent as were companies which had not theretofore timely accepted said Ordinance No. 12723; and the acceptance and requirements under the Keyes Ordinance were substantially the same as those which had theretofore been prescribed in said Ordinance No. 12723. It is conceded that within the ninety days prescribed by the Keyes Ordinance, the respondent had and possessed such a charter as is designated by said ordinance, and this being the only requirement, except that the acceptor render public service, which phase is hereafter dealt with, it is found as a matter of law that the respondent company was eligible to qualify under this act and, upon qualifying, to obtain permits and to operate in the underground district.

"Upon this branch of the law of the case I find, as a matter of fact, that the city officials, having charge of the administration, construed the ordinance as above interpreted.

"Relative to the contention that at the meeting held within ninety days after the approval of the act, the board exhausted its power to assign streets or to authorize conduit construction and that the applicants lost forever all rights to streets and privileges not then assigned to them or not embraced in the application and detailed statement then filed, we find the following ordinance provisions:

" 'Any person, etc., . . . desiring to place said wires, etc., . . . is hereby authorized, after the expiration of ninety days from the approval of this ordinance, to construct underground conduits . . . but must apply and receive from the Board of Public Improvements a permit . . . ; said application to be accompanied by full, general and detailed plans showing the capacity and dimensions of said conduits, etc., . . . [Sec. 604-E.]

" 'The Board of Public Improvements is hereby authorized and directed, upon receipt of an application made as provided in Section 604-E, or upon its own mo-

tion, to designate a day, which shall not be more than ninety days after approval of this amendatory ordinance, on which they will consider the matter of constructing conduits, etc., . . . in the streets, alleys, and public places in said application or motion, and shall give fifteen days public notice by advertisement . . . of the time and place and object of their meeting and of the streets to be considered, and on such day all parties interested may appear and any person . . . specified in Section 604-E desiring to construct a conduit on any street, alley or public place named in the advertisement, shall at that time present in writing, plans and details and statement of their requirements. After said hearing, the Board of Public Improvements shall consider all of the applications, statements, plans and details presented and examine into the space available for conduits or ducts under the streets, alleys and public places named in the advertisement, and shall decide upon, prepare and approve such plans, etc., as in their opinion the public interests seem to demand. [Sec. 604-F.]

" 'All persons, etc., . . . which fail to appear on the day and at the time designated and submit applications above stated, or fail to accept in writing the apportionment of cost made by the board . . shall be excluded from all rights or privilege to obtain, under this ordinance, conduit, duct or manhole facilities in the streets, alleys or public places named in the advertisement, . . . . but shall not be excluded from such privileges . . . in such streets, alleys and public places . . . as are not included in said advertisement, and no person or corporation shall thereafter obtain a permit under this ordinance for conduit privileges within such portions of the streets, alleys and public places named in said advertisement . . . but in reference to all streets, alleys or public places which have not been assigned or which, having been assigned and are not occupied as herein provided, the Board of Public Improvements may proceed and such persons, corporations or associations as are specified in

Section 604-E may make application and may acquire rights at any time hereafter . . . '[Sec. 604-G.]

"Although it is the command that all wires in the underground district be placed below the surface, the above provisions indicate that at the initial meeting prescribed, the board was not required to formulate plans for the full accomplishment of the purpose, or to assign rights in all the streets within that district, but merely as to the streets named in the various applications filed or designated by the board upon its own motion, and then only such streets as were named in the advertisement and notice of said initial meeting. It would further seem that as to streets not named in said application or motion or advertisement. and streets not assigned at said meeting or being assigned, have not been occupied, any company qualified to operate under the ordinance could at any time after said initial meeting, apply for and receive permits to occupy such streets and to do conduit construction therein. Any other construction would defeat the purpose of the act in reference to streets not then assigned or having been assigned were never occupied. Upon this question of law, there has been much contrariety of opinion among the city counselors and some among the officials who directly administered the act, but the latter-named officers have quite generally, thought not in all cases, interpreted the act in the manner above indicated. The contrary opinions are not based primarily upon the provisions above pointed out, but upon that part of section 604-G next below in bold-face type, 'but in reference to all streets, alleys or public places which have not been assigned or which, having been assigned and are not occupied as herein provided, the Board of Public Improvements may proceed, and such person, corporation or association as are specified in Section 604-E, may make application *and may acquire rights at any time hereafter, in the manner and subject to the same obligations, duties and conditions provided in this ordinance,*

"Of this provision, it is said that in order to acquire rights thereunder, the same must be done on precisely the same conditions as are set forth in other parts of the ordinance, and that one of these conditions is, the presentation of the application at the initial meeting, and that since applications of the kind under discussion were not and could not be made at that time, the provisions first above set out are not capable of application. It does not seem to me that this general language can be properly so construed as to nullify and completely destroy the express language above referred to, but that the same is qualified by and must be construed in connection with its immediate and relevant context. A contrary construction would make these express provisions impossible of use and application. I am constrained to believe that what was meant by this language is merely that applications in due form, together with detailed statements, plans, etc. were required to be presented to the board at any time authority was sought and thereupon the board could proceed to assign such additional streets and authorize such additional conduit construction as were embraced in said last-filed applications, statements, plans, etc. I therefore conclude that in so far as this ordinance governs, the respondent is within its lawful rights in its occupancy of streets within the underground district.

"What is known as the overhead district is not defined by metes and bounds, but consists of that part of the city which remains after the specifically defined underground district is carved out. The ordinance does not prescribe that in this district wires shall be placed above or below the ground. That is, there is not express inhibition against either overhead or underground wires and cables. Section 604-E, which is the section prescribing what companies can operate below the ground, contains the following provision: 'and desiring to place wires under the surface of any of the streets, alleys or public places of the City of St. Louis, is hereby authorized . . . to construct underground conduits,' etc,

"Section 604-G, which deals with the initial meeting and with persons failing to appear thereat, contains the following clause: 'all persons, etc., which fail to appear at the time designated . . shall be excluded from all right or privilege to obtain under this ordinance conduit facilities in the streets, alleys and public places or within the territory defined in section 604-A, but shall not be excluded from such privileges within such portions of the streets, etc., as are not within said territory defined in Section 604-A.'

"It will be observed that the section first quoted does not use the language 'desiring to place wires in the streets of the underground district,' but uses the terms "desiring to place wires under the surface of any of the streets of the City of St. Louis.' The other provisions quoted clearly disclose that the board has the power to grant permits for underground construction outside of the prescribed underground district. This seems clear from the language used and likewise from what seems from the act to have been the judgment of the Assembly that underground wires were preferable to overhead wires. After specifically compelling all wires in a certain part of the city to be placed below the ground, it would hardly be reasonable to hold that it intends that wires could not be placed below the ground in other parts of the city, especially when no such inhibition is expressly found in the act. If such underground construction in the overhead district is authorized by the ordinance, then the act clearly authorizes such construction by all companies which it authorizes to operate in the underground district. I therefore conclude that the respondent company has the same underground rights in the overhead district as it has in the underground district."

III. We also agree, in all respects except as hereinafter pointed out, with the opinion of the learned commissioner on the question of the alleged forfeiture of

Non-user. respondent's right by non-user, abandonment and laches, and for that reason we again quote from his report.

"In order to occupy the public streets and to obtain and preserve authority therefor, not only the Keyes Ordinance, but the general law required of respondent that it at all times serve the public. From the beginning up to February, 1901, it intentionally limited its service and facilities, with two or three exceptions, to the occupants and tenants of a group of buildings owned by the persons who owned its stock and directed its operations, from February, 1901, until 1907 it, without exception, confined its service to the class and group stated and expressly declined to serve others; and from 1907 to 1913 it again, with a few exceptions, so limited and confined its operations and service, but during all those years it was actively serving said class and group and using its plant, wires and facilities for that purpose. Such tenants and occupants, outside of Brookings, Cupples and Washington University, were not connected with the respondent as stockholders or otherwise, and bought their current and electrical service directly from respondent in the usual and ordinary way.

"The record is indefinite as to the number of such tenants and occupants, but from the exhibit marked 'Plant Exhibit by Agreement' it appears that about thirty-two separate business concerns were occupying the group of buildings mentioned and that the buildings partly occupied eight or ten city blocks. Within this territory, however, there were other buildings and tenants not included within the group so served. It further appears that such other buildings and occupants, with the few noted exceptions which were served by respondent, were served by other electric and power companies. It further appears that the occupants of the buildings served by respondent were engaged in the wholesale grocery, wholesale dry goods, warehouse, manufacturing and some other businesses. The service thus rendered by respond-

ent was about as much as its plant and facilities, as then equipped, was capable of performing.

"Does the conduct and limited service above outlined legally constitute a non-user and failure to serve the public to such an extent as to forfeit its franchise rights and put an end to its corporate existence as a public service corporation? I am inclined to the legal opinion that they do not. [Tap Line Cases, 234 U. S. 1; United States v. Union Stock Yards, 226 U. S. 286; Union Stock Yards Co. v. United States, 169 Fed. 404; Union Lime Co. v. Railroad, 233 U. S. 211.]

" 'It is the right of the public to use the road's facilities and to demand service of it, rather than the extent of its business, which is the real criterion determinative of its character.' The respondent, during all these years (except to the extent later pointed out from 1901 to 1907) was continuously serving a part of the public and was otherwise so operating and holding itself out, that in my opinion any person accessible to its facilities could, during these years, have demanded of respondent underground service. To the extent that it declined to serve such persons as applied to it, for the reason that such persons were not tenants or occupants of said group of buildings, it breached its duty as a public service corporation, but the persons so refused had their own remedy. These instances were comparatively few and occurred years ago, and such breach is not, in my opinion, sufficient at this late date to warrant the severe penalty now asked. If I am correct in my legal conclusion that the respondent never acquired overhead rights in either the overhead or underground district and could not so acquire them under the ordinance, it cannot be charged with dereliction in respect to its failure to serve and provide the public with overhead facilities. Just what respondent's full duty was with respect to extending its equipment and facilities to other portions of the city and tendering its service to persons who had not requested it, I shall not undertake to define, but in this connection it might be noted that in

order to do this, additional capital, over and above its then stock of $5,000, would have been necessary.

"The case of State ex rel. v. Light & Development Company, 246 Mo. 618, is cited by relator as declaring the doctrine that such limited service as is here shown did not constitute a public service, but as I read that decision the franchise there was not declared forfeited, because it had rendered limited service, which, in point of fact, it had, but because it had discontinued and wholly abandoned even the limited service that it had theretofore performed, and this leads up to a question presented by this record which, to my mind, is quite different to the one just discussed.

"On February 8, 1901, the respondent, through officers duly authorized to so act for it, filed with the City Comptroller an instrument and declaration in writing to the effect that it would thereafter make no settlements or payments of the required tax on its gross earnings for the reason that from that date it would permit Washington University to use its conduits, free of charge, to supply light and power to said university tenants only. The settlements and payments which it thus declared it would not thereafter make were required by the Keyes Ordinance and other ordinances to be made by all companies using the streets for electrical purposes and operating under said ordinance. In order to obtain its authority to operate under the Keyes Ordinance it was necessary for the respondent to agree that it would, and, in point of fact, had bound himself to make such settlements and payments semi-annually. As I read the language of this instrument, it is a clear declaration on the part of respondent to surrender to another distinct entity, the use of all its wires and to so completely abandon the use thereof as to free itself from the control of the ordinances governing public service corporations and from the obligations which such ordinances impose. It expressly recited that the persons and tenants which it had heretofore served would thereafter be served, not by it, but by another. For six years this official declaration was permitted to

stand without change, and during those years, it was adhered to in practice at least to the extent of making no such settlements or payments. Absent other facts and considerations, I would legally conclude that this constituted acts of deliberate abandonment for which its charter should be declared forfeited, but there are other considerations which must be weighed. Whether in point of fact during the six years mentioned Washington University, as an entity distinct from respondent and as distinct from a mere stockholder of the respondent, itself used and operated these wires, as the declaration indicates was the intention, is not clear from the record. It does appear, however, that during that time the respondent had its own officers and at least some employees and was assessed with and paid both personal and franchise taxes. The request and application for a permit in the early part of 1907, and before it had filed its settlements and made payments of the tax for the years mentioned, were made by and in the name of the respondent company. It is further disclosed that after the early part of 1907 all the business transactions were conducted by and in its name, and in that year settlements and payments in the aggregate were made of the gross-earnings tax for the six prior years mentioned and the same were received by the city officials who had knowledge of the declaration filed in 1901 and of respondent's conduct during said six-year period. From that time on, statements and payments of the gross-earnings tax, as well as personal and franchise taxes, were duly made and paid and from that time on to 1913 the respondent directly, through its officers and employees continued to serve the class and group of buildings before stated, and from 1912 numerous permits for overhead construction were issued to respondent by the Board of Public Improvements and since 1913 it has been uniformly recognized by the State Public Service Commission as an existent public service company. It has also, beginning in 1912, expended and invested the sums of money heretofore stated, and I am of the opinion that in so far as concerns a forfeiture of

its rights by reason of its declaration in 1901 and its conduct during the six years following, the doctrine of laches should be applied. [St. Joseph v. Railroad, 268 Mo. 47; Town of Mount Vallo v. School District, 268 Mo. 217; Simpson v. Stoddard County, 173 Mo. 421; Ex rel. v. Light and Development Co., 246 Mo. l. c. 642.]

"In thus concluding I am, of course, assuming that I am correct in my former conclusion that the limited service rendered by respondent up to 1913 was, in point of law, a sufficient public service to give it a legal public character. If I am wrong in that, my conclusion on the application of the doctrine of laches to this particular phase would be just the contrary. To my mind, there is a sound reason for distinction in applying this doctrine to cases of a temporarily abandoned but subsequently resumed right which had been legally conferred, and not applying it to cases where no legal right had at any time ever existed."

The commissioner then proceeds to argue that non-user, abandonment and laches cannot apply to respondent's rights to operate overhead in the overhead district for the reason that, as he had previously found, respondent never had such rights. On this point we have felt compelled to announce a contrary conclusion, as above stated. We think, however, that the reasoning of the commissioner on these questions in support of his conclusions concerning respondent's rights in the underground district may be applied almost in entirety to its rights to operate overhead in the overhead district, and, when taken in conjunction with what we have said in this opinion respecting respondent's rights in the overhead district, fully justifies a finding in respondent's favor on the question of non-user, abandonment and laches in the overhead district, as well as elsewhere. The general scheme provided by various pertinent ordinances here involved seems to contemplate that permits to occupy certain streets and alleys should be obtained by electric light corporations desiring to operate upon such public ways, as and when such corporations desired to commence op-

erations. Such permits might be disregarded by the Board of Public Service if not used by the corporations, and such streets might be allotted to other companies. The Keyes Ordinance did not contemplate an immediate occupancy of all of the public ways of the city for lighting purposes, even in the limited underground district. We do not think it a necessary conclusion that because a franchise holder did not operate in all districts in which it was authorized to operate, it thereby lost all authority to operate in such unoccupied districts.

IV. Respondent questions the right of the Attorney-General to maintain this proceeding, upon the ground that the State thereby is lending its aid to one **Right of Attorney-General.** party to a suit which is in realty merely a private controversy. With slight modification, we adopt the following views of the commissioner upon that point:

"Upon the question of the Attorney-General's right to institute and maintain this action, I think there is no doubt. Neither the information nor the proof offered discloses that any legal claim of the North American Company or any of its subsidiaries, nor any conflicting legal claim of said companies and respondent are involved or can be determined in this action. It is likely true that in a business and practical way, respondent's competitors have an interest in respondent's ouster, but such is usually the situation in all ouster proceedings. If the question involved was whether respondent was intruding and trespassing upon some particular legal right of its competitor or had no rights because of the alleged superior right of some other person, the action could not be maintained, but such are not the issues here. The question here is, whether the respondent is exercising a public franchise which the public has not granted it, and is thereby trespassing upon the rights of the public. When such questions constitute the issue, I think it wholly immaterial as to what person brought the matter to the attention and knowledge of the Attorney-General and that

it is further immaterial as to just what, or what kind, of individual activity was necessary to cause such public law officer to officially act, and I think it further immaterial that practical benefits will accrue to others, though competitors, as the result of a finding that the person charged is a trespasser upon public rights. I also think that it is clearly within the right of the Attorney-General to accept such legal assistance or to name such associate counsel as he sees fit in performing his official work.''

The modification which we have in mind is this, that we do not regard it as ''wholly immaterial'' what private zeal inspired official action. We do not question the right of any citizen, regardless of motive, to bring violations of public rights to the attention of the proper representatives of the public, nor do we doubt the right of the Attorney-General to avail himself of any assistance which he may be able to obtain from private sources to aid him in the discharge of his public duties. But proceedings such as the one in hand are instituted for the benefit of the public. It is to the extent, and only to the extent, that they redound to the public good, that the State is interested, and in determining such a proceeding and rendering judgment therein the courts may give due weight to that consideration. In cases where a municipality is peculiarly interested, but is quiescent; where it has repeatedly been solicited to litigate supposed infringements upon its rights, and has repeatedly declined to do so, and where it is a matter of grave doubt whether the real interest of the public would not best be subserved by a policy of non-interference, the courts may properly take at least sidelong cognizance of the motives inspiring the private citizens whose insistence sets the machinery of the State in motion. Such considerations are not, we think, wholly immaterial. [State ex rel. v. Janesville Water Co., 92 Wis. 496, l. c. 500; Bailey on Habeas Corpus and Special Remedies, Vol. 2, p. 1333.]

This case has been briefed and argued with marked care and ability by both sides. The questions presented

for our consideration are very numerous. A due regard for the limitations of time and space forbids a discussion of such of these questions as are not necessary to a decision of the case, but it should not therefore be concluded that such questions have not been considered, nor that the labor involved in presenting them is wholly lost. The points which have been decided are decisive of the case.

The writ of ouster should be denied, and this proceeding should be dismissed. It is so ordered. All concur, except *Woodson, J.,* absent.