## JACOBS *v.* PRICHARD, TRUSTEE.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 93. Submitted December 8, 1911.—Decided February 19, 1912.

In allotting Indian lands, Congress can determine the conditions under which they shall be alienated by the allottees, and titles resting on deeds of Commissioners and consents of the allottees required by the statute under which the lands were allotted are to be determined by the Federal statute, and not by the laws of the States.

Under the act of March 3, 1893, 27 Stat. 612, c. 209, and the amendatory act of June 7, 1897, 30 Stat. 62, c. 3, carrying out the treaty with the Omaha Indians of 1854, the consent required to be given to the Commissioner for sale of land of allottee Indians in the Puyallup Reservation in Washington was not a mere power to sell

which terminated with the death of the giver, but an agreement which continued in force after death.

The rule that where ambiguity exists courts will follow the construction placed on a statute by the Department charged with its execution is strengthened where the statute itself directs such Department to make the necessary regulations to carry it into effect.

Habits of Indian life will be considered in construing a statute providing methods for a sale of Indian lands, and it will not be presumed that Congress would insert therein a condition which defeats an approved sale by the death of a roving Indian before the delivery of the deed.

46 Washington, 562, affirmed.

THE facts, which involve the title to lands in the Puyallup Indian Reservation allotted under the treaty with the Omaha Indians and the acts of March 3, 1893, and June 7, 1897, are stated in the opinion.

*Mr. W. H. Doolittle,* with whom *Mr. E. D. Wilcox* and *Mr. Jesse Thomas* were on the brief, for plaintiffs in error:

It is immaterial in this case whether or not the Department has construed the so-called consent to be something more than a naked power to sell, as this is a question of law, and not of fact, and while the findings of the Department of the Interior, especially the Land Department and its various branches, are held to be binding on questions of fact, no such rule can be found as to questions of law on rulings made by officers of the departments of the Government. *Moore v. Robbins,* 96 U. S. 530; *Marquez v. Frisbie,* 101 U. S. 473; *Shepley v. Cowen,* 91 U. S. 330; *Johnson v. Towsley,* 13 Wall. 72; *Quimby v. Conlan,* 104 U. S. 420.

The regulation of a department of the Government is not to control the construction of an act of Congress when its meaning is plain. *Robertson v. Downing,* 127 U. S. 402.

Even if there was trust created in the commission to sell this land, it is not a trust coupled with an interest, and it would not survive.

The Indians gave up their claims to other land and took this in payment, and after the issuance of the patent to an individual, it was his absolutely and for value given. *Lykins* v. *McGrath*, 184 U. S. 169.

The consent was a naked power to sell, and, where, as in the case at bar, no sale was made during the period of ownership by the giver of the consent, the power terminated. The title to the land had passed from the United States by its patent and the commissioners were only agents of the Indian to sell the land. No sale having been made there was nothing to continue in force after death, as the land, after the death of the allottee, was the property of another. Under the act of Congress of 1887, 24 Stats. 388, the laws of the State of Washington govern the descent of this land. See Session Laws of 1895, § 1, p. 197.

As to the construction of the acts of 1893 and of 1897 in their application to the Puyallup Indians and their lands, see *United States* v. *Kopp*, 110 Fed. Rep. 160; *Goudy* v. *Meath*, 38 Wisconsin, 129, aff'd in *Goudy* v. *Meath*, 203 U. S. 146; *Wa-la-note-tke-tying* v. *Carter*, 53 Pac. Rep. 106; *Re Huff*, 197 U. S. 488.

After the death of the parents in order to divest these heirs of their title to the land one of two things must appear: First, that the plaintiffs in error, having power to do so, have conveyed the land; which it is nowhere claimed they have done; or second, that the paper executed gave some right or authority to the commissioner that survived the giver. The instrument of March 7, 1898, is of no greater power or authority than an ordinary power of attorney, and is subject to the same rules and restrictions. *Hunt* v. *Rousmanier's Admstrs.*, 8 Wheat. 174.

The power of an agent ceases on the death of his principal. If an act of agency be done, subsequent to the decease of the principal, though his death be unknown to

the agent, the act is void. *Glat* v. *Galloway*, 4 Peters, 332; *McCasky* v. *Barr*, 50 Fed. Rep. 712; *Frink* v. *Roe*, 70 California, 296; *Staples* v. *Broadbury*, 8 Maine, 181; Story on Agency, § 489; *Norton* v. *Sjolseth*, 43 Washington, 327.

Even if there had been a trust imposed upon the commissioner by consent, it was revoked by the death of Charley Jacobs prior to its execution. *Harmon* v. *Smith*, 38 Fed. Rep. 482; 4 Kent's Comm. 310 and note; *Gartland* v. *Nunn*, 11 Arkansas, 720; *Bradstreet* v. *Kinsella*, 76 Missouri, 63; 28 Am. & Eng. Enc. of Law (2d ed.), 1000.

The Secretary of the Interior has no judicial power to adjudge a forfeiture, to decide questions of inheritance or to divest the owner of his title without his knowledge or consent. *Richardville* v. *Thorp*, 28 Fed. Rep. 52; *Jones* v. *Meehan*, 175 U. S. 1.

To allow the construction contended for by respondent, means that the property of plaintiffs in error will be taken from them without due process of law, and contrary to the Fourteenth Amendment.

Plaintiffs in error have been vested with the title by descent from their ancestors and cannot be divested of the title without being made personally parties to the proceeding.

The record does not show a long continued construction of this consent or that it has become a rule of property, or that there is any title involved, except that in this case. This is the first time the matter has ever been before any court.

Defendant in error made no inquiry or investigation before his purchase, but relied wholly upon the regularity of the proceedings.

The act of March 3, 1893, is in derogation of the usual and ordinary rights of citizens, and it will not be enlarged, but will rather be limited and strictly construed by the court.

*Mr. Stanton Warburton*, with whom *Mr. Overton G. Ellis* and *Mr. John D. Fletcher* were on the brief, for defendant in error:

The allottees named in the patent from the United States took a base or qualified fee simple title subject to temporary restrictions on the right of alienation as held by the Supreme Court of the State of Washington in passing upon a similar patent. *Guyatt* v. *Kautz*, 41 Washington, 115.

The question here presented for determination is not what title Charley Jacobs took as head of a family under the patent; but what was the nature and effect of the written agreement of consent executed by the allottees on March 7, 1898, to the commissioner, appointing him trustee to sell the land in question under the provisions of the acts of March 3, 1893, and June 7, 1897. The act of June 7, 1897, is in all respects similar to the act of March 3, 1893, except that it reduces the number of commissioners to one instead of three. The act of March 3, 1893, does not contemplate the execution of successive agreements of consent; its terms were complied with by the execution of the one agreement of consent provided for in said act, by the original allottees.

The United States was not under any obligations to patent these lands to the Indians. Its determination so to do was voluntary and was an act of gratuity. It therefore had the power to place any condition it might see fit in the grant. *Eells* v. *Ross*, 64 Fed. Rep. 417, 421.

The restriction of alienation was a valid restriction, in no wise inconsistent either with the estate granted or with the citizenship of the Indian. It was so held in *Smythe* v. *Henry*, 41 Fed. Rep. 705; *Libby* v. *Clark*, 118 U. S. 250.

The patent issued on January 30, 1886, prohibited, absolutely, alienation for a longer period than two years.

Congress, in pursuance of the power reserved in the

patent itself, did, by the act of March 3, 1893, confer the power of alienation and prescribe the manner of its exercise. The Government had reserved this power in the patent itself, and the courts have no authority to invoke any technical rules of conveyancing to change or modify the manner in said act provided. *Smythe* v. *Henry*, 41 Fed. Rep. 705.

The Department of the Interior has universally, in all its dealings with the Puyallup Indians and these Indian lands, construed the act in this manner. See letter of July 2, 1897, to Clinton A. Snowden, which contains a clear statement of the construction of the Department as to the meaning of this act, and the court should be slow to adopt a different construction when the terms of the statute warrant the construction given it by the Department.

Where a statute entrusted the carrying out of its own provisions to one of the Executive Departments of the Government, the interpretation of the statute by such department will be followed by the courts unless there are most cogent reasons to the contrary. *Prichard* v. *Jacobs*, 46 Washington, 562, 570; *United States* v. *Moore*, 95 U. S. 760, 764; *Edwards* v. *Darby*, 12 Wheat. 206; *Brown* v. *United States*, 113 U. S. 568, 574; *Louisiana* v. *Garfield*, 211 U. S. 70, 78; *Robertson* v. *Downing*, 127 U. S. 607, 614; *United States* v. *State Bank*, 6 Peters, 29, 40.

In all cases of ambiguity the contemporaneous construction not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling. *Schell* v. *Fauche*, 138 U. S. 562, 573; *United States* v. *Cerecedo*, 209 U. S. 337; *Hastings & Dakota R. Co.* v. *Whitney*, 132 U. S. 357, 366; *United States* v. *Burlington R. R. Co.*, 96 U. S. 334; *United States* v. *Pugh*, 99 U. S. 265, 272; *Hahn* v. *United States*, 107 U. S. 402, 406; *Smythe* v. *Fiske*, 23 Wall. 374, 383; *United States* v. *Johnson*, 124 U. S. 236, 255;

*United States* v. *Finnell*, 185 U. S. 236, 254; *United States* v. *Alabama R. R. Co.*, 142 U. S. 615, 622; *United States* v. *Philbrick*, 120 U. S. 52, 59; *Stuart* v. *Laird*, 1 Cranch, 299, 309.

State courts have likewise followed this same rule in construing statutes. *McSorley* v. *Hill*, 2 Washington, 638, 651; *Keane* v. *Brygger*, 3 Washington, 338, 350; Sutherland, Stat. Const. (2d ed.), § 474; *Smith* v. *Ross*, 42 Washington, 439, 445; *Blair* v. *Brown*, 17 Washington, 570, 573.

The Supreme Court of Wisconsin holds that a uniform construction by the department to which an act is referred for the carrying out of its provisions will be followed by the courts even when the courts would not have so construed the act in the first instance. *Herrington* v. *Smith*, 28 Wisconsin, 68; *Bloxham* v. *Electric Light* (Fla.), 18 So. Rep. 444; *Copper Queen Mining Co.* v. *Arizona*, 84 Pac. Rep. 511, 516; *Van Veen* v. *Graham County*, 108 Pac. Rep. (Ariz.) 252.

The land was sold for its fair value. The purchaser has paid the price. The Department has examined and approved all steps leading up to the deed, and the purchaser took his deed relying upon the Department, to which the act itself entrusted the execution of its provisions, as having done its duty in the premises. The purposes of the act have been fully met; viz.: the protection of the Indians from improvident sales.

It makes no difference that Charley Jacobs was a citizen of the United States. There is no authority for the contention that a citizen cannot hold a base or qualified title. There is ample authority for the converse. *Beck* v. *Flourney Co.*, 65 Fed. Rep. 30, 35; *Eells* v. *Ross*, 64 Fed. Rep. 417, 421; *Smythe* v. *Henry*, 41 Fed. Rep. 705; *United States* v. *Flourney Co.*, 71 Fed. Rep. 576, 579.

The authorities relied upon by the plaintiffs in error are not applicable. *Guyatt* v. *Kautz*, 41 Washington, 115;

*Pickering* v. *Lomax,* 145 U. S. 310, 316; *Lykins* v. *McGrath,* 184 U. S. 169.

The fact that this land has advanced in value since the sale, is no reason whatever for now seeking to so construe the statute as to invalidate the title of the defendant in error.

Since the decision in the case at bar, the Supreme Court of the State of Washington has passed upon the same question, and followed this decision in the case of *Little Bill* v. *Swanson,* 117 Pac. Rep. 481; *Little Bill* v. *Dyslin,* 117 Pac. Rep. 487.

See also on question of Indian lands and the government supervision over the same, *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294; *Starr* v. *Campbell,* 208 U. S. 527; *Marquez* v. *Frisbie,* 101 U. S. 473.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Error to the Supreme Court of Washington to review a decree of that court which affirmed a decree of the Superior Court of the County of Pierce adjudging defendant in error, who was plaintiff in the trial court, to be the owner of the east half and the east half of the east half of the west half of the northeast quarter of the northwest quarter of section 35, township 21 N., R. 3 east of the Willamette Meridian, Pierce County, Washington, formerly in King County, Washington.

The land lies in the Puyallup Indian Reservation and was allotted or patented by the United States on January 30, 1886, to Charley Jacobs, the head of a family consisting of himself, Julia, Annie, Frank and Oscar, all Puyallup Indians, the allotment or patent being subject to the stipulations and conditions contained in Art. 6 of the treaty of the United States with the Omaha Indians. Plaintiffs in error were not named in the patent, they not then being born.

Defendant in error claims title under a deed dated February 27, 1901, from C. A. Snowden, trustee and commissioner of Puyallup lands, appointed by the United States Government under an act of Congress dated March 3, 1893 (27 Stat. 612, c. 209), and an amendatory act passed June 7, 1897 (30 Stat. 62, c. 3).

Plaintiffs in error claim title to an undivided one-third part of the lands as heirs of Charley and Julia Jacobs, deceased, and contend that the deed from Snowden is void as to them or as to the interest they would take as such heirs for the reason that the Snowden sale and deed were after the death of Charley and Julia Jacobs.

Article 6 of the treaty of the United States with the Omaha Indians (March 16, 1854, 10 Stat. 1043), to the conditions of which the patent to Charley Jacobs was made subject, empowered the President to cause allotments to be made from reservation lands to such Indians as were willing to avail themselves of the privilege and who would locate on the same as permanent homes. The patent was to be issued upon the further condition that the assigned land should not "be aliened or leased for a longer term than two years" and "should be exempt from levy, sale or forfeiture." Upon the formation of a State these restrictions could be removed by the legislature, but it was provided that they could not be removed without the consent of Congress. It was also provided that lands not necessary for assignment might be sold for the benefit of the Indians under such rules and regulations as might thereafter be prescribed by Congress, or the President of the United States.

Under the act of March 3, 1893, the President was empowered to appoint a commission of three persons to select and appraise such portion of the allotted lands not required for homes of the Indian allottees. It was provided that if the Secretary of the Interior approved the selections and the appraisement the lands selected should

be sold for the benefit of the allottees, after due notice, at public auction, at no less than the appraised value.

It was the duty of the commission to superintend the sale of the lands, ascertain the true owners thereof, and have guardians appointed for minor heirs of deceased allottees and make deeds of the lands to the purchasers thereof, subject to the approval of the Secretary of the Interior. The deeds, it was provided, should operate as a complete conveyance of the lands upon a full payment of the purchase money. The disposition of the money was provided for, and it was provided further that no part of the lands should be offered for sale until the Indian or Indians entitled to the same should sign a written agreement consenting to the sale thereof, and appointing the commissioners, or a majority of them, trustees to sell the land and make deeds to the purchasers. The approval of the Secretary was made necessary to the validity of the deeds, and he was directed to make all necessary regulations to carry out the provisions of the act.

On November 6, 1893, the Secretary instructed the commissioners, in accordance with the terms of the act as to the appraisement of the lands, and to ascertain who were allottees or the heirs of allottees or heads of families under the laws of Washington, to have guardians appointed for the minor heirs of deceased allottees and to obtain the consent of the heirs of twenty-one years and of such guardians. The commissioners were directed to report to the Secretary their action for approval, and, if approved, further instructions were to be given.

By an act subsequent to that of March 3, 1893, to-wit, an act of June 7, 1897, the number of commissioners was reduced to one and Clinton A. Snowden was appointed commissioner. Instructions were given to him and he was informed as follows: "That the title under these patents vests in the family whose names are recited in the patent, and not in the head of the family. It is

necessary to obtain the written consent of all the members
of the family named in the patent. That it is necessary
to have legal guardians appointed for minors who are
themselves allottees, but not minor heirs of deceased
allottees. It is necessary to obtain the written consent
of sale of allotments of all members of the family named
in the patent, and natural guardians and parents of minors
are incompetent for this purpose, as in the case of minor
heirs of deceased allottees."

On January 18, 1901, in answer to an inquiry of Snow-
den, the Secretary instructed him that where the allottees
and true owners of the lands had executed consents of sale
which had been approved by the Secretary it was the
practice of the Department to continue the sale of the
lands covered thereby, though the allottee or owner died,
and to distribute the funds arising therefrom to his or her
heirs, the Department regarding the "consents as remain-
ing in full force and effect upon the decease of the Indian
executing the same," they being "in the nature of an agree-
ment or contract to be carried out for the sole benefit of
his heirs in case of his decease." The Secretary added:
"These lands are sold under the provision of the Act of
Congress, March 3, 1893, and not under the laws of the
State of Washington. . . . It is for the Department
to pass upon the sufficiency of consents and not the courts
of the State of Washington."

Charley Jacobs was, as we have seen, the grantee in the
patent as the head of a family consisting of himself, Julia,
Annie, Frank and Oscar. Julia was his wife, Annie his
sister, Frank his son by a former wife, and Oscar his son
by his wife, Julia.

Lillie Jacobs and Ruther Jacobs, plaintiffs in error, are
respectively, a daughter and son of Charley and Julia and
were born, respectively, in the years 1888 and 1891—that
is, after the patent was issued—and necessarily were not
named therein.

Annie, who was named in the patent, died in November, 1888, never having been married, and leaving Charley Jacobs her sole heir. He, on the seventh of March, 1898, Julia Jacobs and Frank Jacobs, all of age and named in the patent, executed a written consent required by the statute directing Commissioner Snowden to sell the lands.

Charley Jacobs, as guardian of Oscar Jacobs, named in the patent, having been previously appointed by the Superior Court of Pierce County, executed a similar consent and also a similar consent as the sole heir of Annie, named in the patent.

These consents and other papers were duly transmitted to the Secretary of the Interior and approved by him, and Snowden, on the twenty-seventh of February, 1901, duly offered the lands for sale at public auction. They were purchased by A. G. Prichard, trustee, in accordance with the statute, he making the payment required. Snowden executed a deed to him, which was duly approved by the Secretary of the Interior, and duly recorded in the Office of Indian Affairs.

Prior to the commencement of this action Prichard made the payments required, which were received and accepted by the Interior Department for distribution to those entitled to the same, including Ruther Jacobs and Lillie Jacobs, plaintiffs in error. Their guardian, E. D. Wilcox, has not received the same and refused to accept the sum, except a cash payment of $420.

Charley Jacobs died January 2, 1900, leaving surviving him, among others, the plaintiffs in error, who, as we have said, were not named in the patent. His death was reported to the Commissioner of Indian Affairs by Snowden May 1, 1900.

Wilcox is the duly appointed guardian of plaintiffs in error, and reported to the court the receipt by him of the payment of $420 made by Prichard. He did not know, however, that the sale by Snowden was after the death of

Charley Jacobs, father of plaintiffs in error, until after the commencement of this suit, and, as soon as he discovered that fact, refused to receive any further payment. The money received by plaintiffs in error as their share of the purchase price of the land was tendered to defendant in error prior to the trial of the action.

At the time Prichard, defendant in error, purchased the land he did not know of the death of Charley Jacobs, and was at no time advised of it or of the existence of plaintiffs in error until shortly before bringing this action. He purchased the property in good faith, relying upon the representations of Snowden, and in the full belief of the regularity of the proceedings.

We have stated the facts thus fully, although they are not disputed, as they exhibit clearly upon what right the Secretary of the Interior proceeded in his instructions to Commissioner Snowden and the strict compliance of the latter with those instructions. It will be observed that where the allottees and true owners executed consents which had been approved by the Secretary, it was the practice of the Department to continue the sale of the lands covered thereby, though the allottee or owner died, and to distribute the funds arising therefrom to his or her heirs, the Department regarding the "consents as remaining in full force upon the decease of the Indian executing the same," they being "in the nature of an agreement or contract to be carried out for the sole benefit of his heirs in case of his decease." The Secretary expressed the view, that the "lands are sold under the provisions of the act of Congress, March 3, 1893, and not under the laws of Washington. . . . ." It is for the department to pass upon the sufficiency of consents and not the courts of Washington."

Defendant in error takes the view that the consents remained good after the decease of the Indian who gave them, in this case Charley Jacobs, and was "in the nature

of a permanent power or trusteeship." On the other hand, plaintiffs in error contend that the consent was a "naked power to sell," and terminated with the death of the giver.

There can be no doubt of the power of Congress to give character to the consents. *United States ex rel. Lowe* v. *Fisher, ante,* p. 95; *The Cherokee Nation et al.* v. *Whitmire, Trustee, ante,* p. 108. The questions in the case, therefore, turn upon the statute, and both sides invoke it to sustain their respective contentions.

The patent to Charley Jacobs was made subject to the conditions and restrictions of the sixth article of the treaty. In other words, there was a limitation upon the right of alienation of the patented lands, and the ultimate power to remove this restriction and grant a right of full alienation was reserved to Congress. The act of 1893 was an exercise of this power. It provided for the sale of such part of the allotted lands as was not required for the homes of the Indians, and prescribed the conditions of the sale to be "a written agreement consenting to the sale," signed by the Indian or Indians entitled to the allotted land offered for sale. And it was provided further that the agreement should constitute the commissioners, or a majority of them (subsequently one commissioner), trustees to sell the lands and "make deeds to the purchasers for the same," subject to the approval of the Secretary of the Interior, which deeds should "operate as a complete conveyance of the land upon the full payment of the purchase money." It is manifest that the "consent" required created something more than a mere revocable agency. It was a written agreement giving the commissioner (we drop the plural) full power to execute the provision and policy of the act of Congress, a power which could be confidently counted on as continuing against contingencies, and to terminate in a "complete conveyance of the land."

That the "consent" was to have this character was the

immediate and continued construction of the act of Congress by the Interior Department, and such construction would determine against ambiguity in the act even if we should admit ambiguity existed. The rule which gives strength to the construction of the officers who are directed to execute the law and who, it has been said, may have written or suggested it, is given an added force from one of the provisions of the act of Congress. It directs the Secretary of the Interior "to make the necessary regulations to carry out the purposes" of its enactment.

But we find no ambiguity in the act when we consider its purpose and the habits of Indian life. It could not have been intended that when proceedings had been instituted under it they should be embarrassed always by the possibility of defeat, and, it may be, progressing up to the moment of the delivery of the deed to a purchaser, should be made useless and nugatory by the death of some roving Indian. It is to be noted that all the proceedings are under the control of the Secretary of the Interior and that any irregularity in them or improvidence in the consents can be corrected by him.

We do not answer in detail the argument of plaintiffs in error based on the law of agency because we do not think its analogies are applicable to the situation.

The Supreme Court of Washington has repeated its ruling in this case in two others, *Little Bill* v. *Swanson*, 117 Pac. Rep. 481; *Same* v. *Dyslin*, Id. 487.

*Judgment affirmed.*