BUTTE MINERS' UNION No. 1 ET AL., APPELLANTS, *v.*
ANACONDA COPPER MINING CO., RESPONDENT.

(No. 8,157.)

(Submitted April 23, 1941. Decided September 27, 1941.)

[118 Pac. (2d) 148.]

420

*Messrs. Wellington D. Rankin, Philip O'Donnell, Charles L. Zimmerman* and *Arthur P. Acher,* for Appellants, submitted an original and a reply brief; *Mr. Rankin* and *Mr. O'Donnell* argued the cause orally.

*Messrs. W. H. Hoover, John V. Dwyer, J. T. Finlen, Jr.,* and *Frank F. Jestrab,* for Respondent, submitted a brief; *Mr. Hoover* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiffs appeal from a judgment of dismissal dated July 24, 1940, and rendered on July 29, by reason of their failure to file an amended complaint after an order filed on July 2, 1940, sustaining defendant's general and special demurrer to the complaint.

The plaintiffs are Butte Miners' Union No. 1, a voluntary association, and twenty individuals, seventeen of whom are alleged to be underground employees actually engaged in mining operations in defendant's mines, and also officers, trustees or committee members of the Union, the other three individuals being officers of the Union but not alleged to be underground employees of defendant.

The complaint alleges among other things that the underground employees of defendant, including the seventeen individual plaintiffs alleged to be such employees, are required to work more than eight hours per day without there being any emergency, and that they will continue to be required to work under those conditions in the future until restrained by the court; that about five thousand persons are interested in this proceeding, that it is not practicable to bring them all before the court, and that the action is brought by the plaintiffs for the benefit of all employees in defendant's underground mines; that there is no plain, speedy or adequate remedy in the ordinary course of law; that some of the plaintiffs and the other underground employees are required to work for eight and three-quarters (8¾) to nine and a half (9½) hours per day; that the said plaintiffs, "and all other miners similarly situated, have been, and now are, required to report at the respective mines where they are employed by said defendant not less than 15 minutes prior to the time that they are to be taken down

into said mines; that upon reporting said miners immediately are under the supervision and direction of said defendant, whereupon said defendant requires each of said miners to obtain a light supplied by said defendant for their use in said mine of a value in excess of fifteen dollars, and to obtain from the defendant such drill bits and other tools and equipment as they may need for their work during said shift in working in said mine; that thereupon said employees are required to and do wait at the mouth of the shaft and are taken down to the workings as fast as the elevator cage facilities will lower them to the workings in said mines; that the said miners are lowered in successive trips of said elevator cages, the last men being lowered to said workings approximately one-half hour after the work of lowering said men has commenced; that thereupon said miners remain in said mine continuously for a period of eight and one-half hours from the time the defendant commenced lowering said men into said mines as aforesaid; that at some time during said eight and one-half hour period said employees are permitted a sufficient time, not exceeding 30 minutes, to eat the lunch which they have taken with them at a time most convenient for the carrying on of work in said mine, and during which said time they are not permitted to leave said mine or the underground workings in which they are engaged at work; that after a period of eight and one-half hours has elapsed from the time that the first men were lowered into said shaft as aforesaid said underground employees are permitted to quit actual mining operations and are thereupon raised to the surface as rapidly as the facilities will permit which requires approximately three-quarters of an hour, the last man being raised to the surface approximately nine and one-half hours from the time they reported for work at the beginning of said shift as aforesaid, and thereupon said miners are required to return and do return said lights supplied them at the beginning of said shift as aforesaid and deliver to the defendant the bits and tools and equipment used in the course of mining operations on said shift until which time they are not free to leave said premises; that for such employment and for

such hours of employment, the defendant pays to such underground employees for eight hours service and no more; that from the time said miners report for work until they return their lights and used bits and other tools and equipment at the conclusion of said shift, said miners perform a day's work of more than eight hours per day, to-wit, from eight and three-quarters to nine and one-half hours per day, contrary to the provisions of Article XVIII, section 4, of the Constitution of Montana and Section 3071, R. C. M. 1935.''

The prayer is for an injunction restraining defendant and its representatives, etc., from requiring plaintiffs and others similarly situated to work longer than eight hours per day.

As noted above, the defendant interposed a general and special demurrer. The grounds of the latter were that the Union, being an unincorporated association, had no legal capacity to sue and that there was a misjoinder of parties plaintiff in that the Union and its three officers were not alleged to be underground employees of the defendant, did not have a direct interest in the subject of action, and were not proper parties.

For many years this state has had constitutional and statutory provisions relating to the hours of labor in underground mines and elsewhere. Section 3071, Revised Codes, was originally enacted in 1901 as section 1 of House Bill 1 (1901 Session Laws page 62), the title of which was "An Act for the Protection of the Health of Men Employed in Underground Mines * * * by Regulating their hours of employment and providing penalties for the violation thereof." It provided that "the period of employment of working men in all underground mines or workings, shall be eight (8) hours per day, except in cases of emergency where life or property is in imminent danger." The provision was amended by section 1 of Chapter 21 of the 1911 Session Laws in a respect not material here. Section 4 of Article XVIII of the Constitution of Montana was adopted in 1904 and provided: "A period of eight hours shall constitute a day's work * * * in underground mines." This provision was amended in 1936 to make it applicable to "all industries, occupations, undertakings and em-

ployments, except farming and stock raising; provided, however, that the legislative assembly may by law reduce the number of hours constituting a day's work whenever in its opinion a reduction will better promote the general welfare * * * ."

On June 25, 1938, the Federal Fair Labor Standards Act ▉ (29 U. S. C., secs. 201 et seq.), enacted for the same general purposes, became law, setting standards of minimum wages per hour and maximum hours per week "in industries engaged in commerce or in the production of goods for commerce" (defining "commerce" as commerce across state lines), and creating a Wage and Hour Division of the United States Department of Labor, under the direction of an Administrator, to enforce its terms by orders subject to review by the federal courts.

It has been held by the United States Supreme Court that the power of Congress over interstate commerce is not confined strictly to the regulation of such commerce, but extends to those intrastate activities which so affect interstate commerce, or the exercise of the power of Congress over it, as to make the regulation of them appropriate means to the attainment of a legitimate end—the exercise of the granted power of Congress to regulate interstate commerce. (*United States* v. *Darby,* 312 U. S. 100, 657, 61 Sup. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430; *Opp Cotton Mills; Inc.,* v. *Administrator,* 312 U. S. 126, 657, 61 Sup. Ct. 524, 85 L. Ed. 624.) In those cases it was held that the wages and hours provisions with reference to the production of goods (lumber and cloth) for interstate commerce were within the powers of Congress under the interstate commerce clause of the United States Constitution. Those holdings are binding upon the state courts. (*Montana Manganese Co.* v. *Ringeling,* 65 Mont. 249, 211 Pac. 333; *Notti* v. *Great Northern Railway Co.,* 110 Mont. 464, 104 Pac. (2d) 7.)

The Administrator made on March 17, 1941, and promulgated on March 23 to become effective as of April 1, 1941 (later extended to May 1), an opinion or ruling relative to hours of labor in underground metal mining, in which he established

an interpretation of the words "hours worked" which includes much of the miners' required expenditure of time of the kind alleged in the complaint to constitute work in excess of the permitted hours per day. It follows that for the purpose of the federal Act, at least, "hours worked" as thus interpreted must be considered as constituting part of the work day and therefore of the work week. That ruling is a public official act of the executive department of the United States, of which the courts of this state must take judicial notice (section 10532, Rev. Codes, paragraph 3), and constitutes an interpretation by the authority in charge of the administration of the federal Act, both that underground metal mines are within the Act as producing goods for commerce and that the described activities of the underground miner are to be considered as part of the work or employment.

Interpretations of Acts by the executive branches within the scope of their proper functions are entitled to great weight (*United States* v. *American Trucking Associations, Inc.,* 310 U. S. 534, 60 Sup. Ct. 1059, 84 L. Ed. 1345), and while they are not binding upon the courts they are entitled to respectful consideration (*State ex rel. Morgan* v. *Knight,* 76 Mont. 71, 245 Pac. 267) and are not to be departed from except for the most cogent reasons (*Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 53 Sup. Ct. 350, 77 L. Ed. 796; *Miller Ins. Agency* v. *Porter,* 93 Mont. 567, 20 Pac. (2d) 643; *Guillot* v. *State Highway Commission,* 102 Mont. 149, 56 Pac. (2d) 1072) or unless clearly erroneous (*Montana Manganese Co.* v. *Ringeling,* supra; *First State Bank* v. *Durand,* 69 Mont. 184, 222 Pac. 434; *State ex rel. City of Butte* v. *Healy,* 105 Mont. 227, 70 Pac. (2d) 437). Indeed, where, as here, the statute directs the executive department to make necessary rules and regulations to carry out its purposes, the courts have even held such necessary rulings and interpretations absolutely controlling unless conflicting with express statutory provisions (*Jacobs* v. *Prichard,* 223 U. S. 200, 32 Sup. Ct. 289, 56 L. Ed. 405; *Maryland Casualty Co.* v. *United States,* 251 U. S. 342, 40 Sup. Ct. 155, 157, 64 L. Ed. 297). In the last cited case the

court said: "It is settled by many recent decisions of this court that regulations by a department of the government, addressed to and reasonably adapted to the enforcement of an Act of Congress, the administration of which is confided to such department, has the force and effect of law if it be not in conflict with express statutory provisions." Obviously, in order to make effective the limitation as to hours of labor in metal mines, it was necessary for the administrator to make an interpretation as to the meaning of "hours worked" and as to the question whether such occupation comes within the terms of the law. But without going so far as to say that the interpretations are binding upon the courts, we feel constrained to hold that in so far as they are not clearly erroneous they should not be departed from except for the most cogent reasons, which are not here apparent. This is especially true since the interpretation is of a federal statute by a federal executive agency especially authorized to administer it and acting within the scope of its authority, subject only to appeal to the federal courts; and it has since been adopted and so followed by at least one federal court in a declaratory judgment in the case of *Sunshine Mining Company* v. *John A. Carver et al.*, 41 Fed. Supp. 60, decided by United States District Judge C. C. Cavanah of the District of Idaho in August, 1941.

Prior to the federal statute, the state constitutional and statutory provisions alone governed the hours of labor in underground metal mines. Upon the exercising of the federal jurisdiction, the federal statute supersedes the state jurisdiction to the extent of any inconsistency, but where not inconsistent the state and federal provisions jointly govern (11 Am. Jur. 306, sec. 8ff). There is no inconsistency between state laws which fix the maximum day's work at eight hours, and the federal law which does not absolutely fix the maximum week's work at forty hours, but indirectly does so by requiring pay for the excess period at one and one-half times the regular rate. Nor is there any absolute inconsistency in applying one definition of "hours worked" to the work day under the state law and another to the work week under the federal law. Thus it

would not be absolutely inconsistent to consider a miner's day under the state law as eight hours work at the working face and to consider it under the federal law as perhaps nine hours under the portal-to-portal interpretation; for the federal limitation is by hours per week and not per day. But for all practical purposes the result would be inconsistent and chaotic. Five work days of eight hours under the portal-to-portal interpretation would constitute a maximum work week under the federal law. But five work days of eight hours at the working face, even though each considered lawful under the state provisions, would constitute more than the lawful work week under the federal law without the payment of the increased wage for the excess hours; and it would, therefore, be necessary to limit the work week to less than five such full work days of eight hours at the working face. That would hardly be practicable, for the operator would be compelled to limit the work week, either to four such working days, or to four and a fraction. The first would constitute an even shorter work week in days than is contemplated by the law, and would possibly shorten it too much for efficient production and the earning of a living wage, which were undoubtedly considered by the Congress in enacting the law. And the second would undoubtedly be even more unsatisfactory, since the direct non-productive time expended other than at the working face would be practically the same for a fractional day as for a full one, and thus would occasion a much greater proportionate loss of directly productive time. It would thus seem for all practical purposes to be inconsistent and impractical to apply the working-face rule to the state law and the portal-to-portal rule to the federal law, and thus, to that extent, to make the laws themselves practically inconsistent. This is especially important, since section 18 of the federal Act (29 U. S. C. 218), indicates that the Act shall supersede state laws establishing a lower minimum wage or a higher maximum workweek.

Since we have no power to overrule the interpretation of the federal statute by the federal executive and judicial branches or to impose a contrary interpretation upon them, our only

alternative, in order to avoid a chaotic condition under our dual form of government, is to adopt a like interpretation of our own statutory and constitutional provisions, in the mutual interest of labor, industry and the general public.

Prior to the interpretation of the federal statute and the present necessity of conforming to it if both the federal and state provisions are to have practical effect, it would have been more difficult to resolve the question. On the one hand while the statutory provision has never been authoritatively construed by any department of the state government, the working-face interpretation seems to have been generally assumed by mutual consent of employer and employee, and in fact a number of unsuccessful attempts have been made to bring about the portal-to-portal interpretation by legislative enactment. On the other hand, the fact that that interpretation has been assumed in the past does not necessarily mean that it must be assumed in the future in the absence of any element of estoppel, and as a matter of fact the general purpose of the regulation of hours of employment was shown by the title of the first enactment in 1901 to be "for the Protection of the Health of Men Employed in Underground Mines," and the purpose expressed in section 4 of Article XVIII of the Constitution of Montana, as amended in 1936, was to "promote the general welfare." Those purposes would seem to depend, not merely on the time devoted directly to the production of ore at the working face, but to the time spent under the employer's orders, both directly and indirectly, for that end. The statutes are to be liberally construed with a view to effect their objects (sec. 4, Rev. Codes), and that would not necessarily seem to be done by limiting their application to the time actually spent at the working face without regard to necessary incidental and preliminary matters, such as procuring tools and equipment and in awaiting and making use of the employer's transportation facilities under the employer's orders or direction, as distinct from time expended for the employees' own purposes and benefit. Numerous cases have so held in various jurisdictions.

But it becomes unnecessary to determine what interpretation ██ this court would have placed upon our constitutional and statutóry provisions as of the time of entry of judgment below, since we consider it a practical necessity to apply the subsequent federal executive and judicial interpretation of the federal statute to our laws of similar application where those interpretations are not clearly erroneous. While ordinarily the question on appeal is whether an error was committed by the trial court, the situation is somewhat different in actions of this kind. The rule is that in injunction suits the appellate court will apply the law existing at the time of its own decision rather than that existing at the time of the decision below. (5 C. J. S., Appeal and Error, p. 1310, sec. 1841, citing authorities, including *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.,* 3 Cal. (2d) 489, 45 Pac. (2d) 972, 978.) In the latter case the court said:

''The effect, on an appealed case, of a change in the law pending the appeal, has given rise to many diverse and some conflicting decisions. * * * In the class of appeal here presented, there should be and there is no question. The present action involves an appeal from an injunction decree, which, by its very nature, acts on the rights of these parties in the future. * * * For this reason, whatever may be the law applicable to appeals generally, the rule is well settled that on appeals involving injunction decrees, the law in effect when the appellate court renders its opinion must be applied. In *American Steel Foundries* v. *Tri-City Central Trades Counsel,* 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, the plaintiff had secured an injunction in a labor dispute. Pending the appeal, a statute was passed materially restricting the use of the injunction in such cases. The United States Supreme Court, Chief Justice Taft writing the opinion, held that the appeal must be determined under the new statute. * * * The same conclusion was reached by the same court in *Texas Co.* v. *Brown,* 258 U. S. 466, 42 Sup. Ct. 375, 66 L. Ed. 721. In that case, after an interlocutory decree had been entered, and pending the appeal, the state Legislature, apparently

in view of the very controversy involved in the case, amended the law under which the decree had been entered. The court held that the appeal must be determined in accordance with the amended statute, stating (258 U. S. 466, page 474, 42 Sup. Ct. 375, 378, 66 L. Ed. 721):

" 'Although passed after the decree below, this Act must be given effect in deciding the appeal, since the case involves only relief by injunction, and this operates wholly *in futuro.*' "

Other decisions to the same effect are *Dr. Miles California Company* v. *Sontag Chain Stores Co.,* 8 Cal. (2d) 178, 64 Pac. (2d) 726; *Ash* v. *Gibson,* 146 Kan. 756, 74 Pac. (2d) 136; *State ex rel. Bussell* v. *Abraham,* 64 Wash. 621, 117 Pac. 501.

While in this instance we have a new executive and judicial interpretation of the law rather than a change of statute itself, the rule should be the same; for since the injunction operates in future it should no more be granted or denied without reference to a new authoritative interpretation of the law than without reference to the enacement of a new statute. In either case the necessity is that equity be presently done, and a change in the law, even after a final injunction, may necessitate a modification or annulment of the injunction (*Santa Rita Oil Co.* v. *State Board,* 112 Mont. 359, 116 Pac. (2d) 1012).

The defendant contends that since the employee is *in pari delicto* with the employer (*State* v. *Livingston Concrete Building & Manufacturing Co.,* 34 Mont. 570, 87 Pac. 980, 9 Ann. Cas. 204; *Melville* v. *Butte-Balaklava Copper Co.,* 47 Mont. 1, 130 Pac. 441), a species of laches, acquiescence, waiver or estoppel exists which deprives him of certain remedies. But this court has never said that such action would deprive a plaintiff of injunctive relief, which is directed to the future rather than to the past, where the defendant has not been misled to its prejudice with reference to the future and the matter involves a public question of great importance. Certainly nothing appears on the face of the complaint to indicate any circumstances showing the elements of laches, acquiescence, waiver or estoppel binding against all of the plaintiffs, or against all of the others on behalf of whom the action is brought.

(See 28 Am. Jur. 258, secs. 62 and 63; 261, sec. 66; 32 C. J. 69, sec. 52½; Id. 71, sec. 55.)

The defendant contends that an injunction should not issue to prevent a criminal act. (Sec. 8710, Rev. Codes.) However, although a penalty is provided for their violation, the provisions in question here were not made primarily to define and punish a crime, but to protect health and the general welfare by regulating hours of employment. The penalty imposed is one way of enforcing the legislative purpose, but its expression in the Act does not necessarily become exclusive so as to prevent remedial action by courts of equity when the general interest and great numbers of individuals are affected. Under the circumstances it would be inequitable for a court of equity to refuse a remedy merely because the statute incidentally provides a criminal penalty for its violation. The fact that the acts complained of are violations of the criminal law is not sufficient ground standing alone to warrant the issuance of an injunction, since the equity court is not a court of criminal jurisdiction. But where there is something more—some interference actual or threatened with property or other personal rights, the equity courts will in proper instances give injunctive relief. Certainly it would be inequitable to deny the workmen injunctive relief against infringement of their statutory rights merely because the employer might afterwards have been punished for the infringement. (28 Am. Jur. 338, sec. 148; 339, sec. 150; 32 C. J. 277, sec. 440.)

Under the circumstances we feel constrained, for the above reasons, to accept the federal interpretation of the federal law, effective as of May 1, 1941, and to apply it to the state constitutional and legislative provisions from and after that date. Since this is an injunction matter it follows that the interpretation should apply and the general demurrer should be ordered overruled.

As to the special demurrer, the situation is otherwise. Although the appellants have assigned error to the sustaining of the special demurrer, they have waived the specification by failing to argue it, if indeed they have not confessed it. In their

brief they have limited themselves to the statements (1) "that we deem all of the questions raised by the special demurrer unimportant"; (2) that the question of misjoinder is immaterial since "17 of the 19 (20) persons named as plaintiffs are actually employed in the mines and are directly affected by the practices complained of"; and (3) that "if only the special demurrer had been sustained we would have amended to avoid the objection raised as to the alleged misjoinder of parties plaintiff which we submit is hypertechnical and of no materiality to the determination of the merits of this controversy however decided."

It is therefore ordered that the judgment be reversed, with directions to the trial court to overrule the general demurrer and to grant the plaintiffs proper time within which to amend their complaint as necessitated by the sustaining of the special demurrer.

ASSOCIATE JUSTICES ERICKSON, ANGSTMAN and ANDERSON concur.

MR. JUSTICE MORRIS:

I dissent. The bone of contention between the plaintiffs and defendant here is as to how the eight-hour period phrase of section 3071 shall be construed. Plaintiffs contend that that phrase means from "collar to collar." The accepted meaning of "collar to collar" in this connection is that the eight hours shall begin from the time the miners arrive at the mouth of the tunnel, portal or shaft of the mine and end when they are returned to the mouth of the mine, after completing their eight-hour shift. The defendant contends that the eight hours means eight hours work down in the mine "at the face" of the workings. The plaintiffs contend that the time employed in assembling their tools, being lowered into the mine, and, at the end of their shift, being lifted out of the mine, replacing their tools, should all be included within the eight hours.

It is alleged in the complaint that it requires approximately fifteen minutes to assemble tools at the beginning of the shift, and about the same time to return them at the end of the shift; that it requires approximately thirty minutes to lower the men into the mines from the time the lowering begins, and approximately forty-five minutes to lift the miners out of the mine. As I understand it, not all the miners would be affected the same way in this process. All of one shift might be at the mouth of the mine ready to go down at the same time, and the same might be true when they were ready to be lifted out of the mine, but it appears that not all can go down or come up at one time.

To arrive at a correct conclusion as to whether the legislature intended an eight-hour day should be from "collar to collar" or at the face of the workings, it becomes necessary to review the history of section 3071. That section was enacted by the legislative assembly in 1901 as section 2 of House Bill No. 1, which appears on page 62 of the Session Laws of that year, and was in exactly the same wording it is today with the exception of that part of the section here quoted which appears in italics: "including railroad or other tunnels," was subsequently added to the section and does not change the law in regard to any question involved here. The section as now in the Codes reads: "The period of employment of working-men in all underground mines or workings, *including railroad or other tunnels,* shall be eight hours per day, except in cases of emergency where life and property is in imminent danger."

At the 1905 session by House Bill 288, again at the 1923 session by House Bill No. 242, again in 1937 by House Bill No. 72, and Senate Bill 166, and again in 1939 by House Bill 55, amendments in each separate session mentioned were proposed to section 3071 for the express purpose of amending that section to express precisely what the plaintiffs now demand this court, by formal opinion, shall say that the section means. Each and all of the five separate bills presented, after being referred to and considered by the appropriate committees, were

reported back, considered in the committee of the whole and were defeated.

To fix the number of hours that shall constitute a day's work in particular occupations or employments is an exclusive legislative prerogative. It is equally well established that it is the exclusive function of the judicial department to construe and determine legislative Acts. By statute, however, and by a long line of decisions, this court, pursuant to the statute, and in accord with the established rule in all other jurisdictions, federal and state, is enjoined to adhere to that fundamental rule of statutory construction which requires all courts to ascertain and give effect to the intention of the legislature as expressed in the statute. (Sec. 10520, Rev. Codes; *Murray Hospital* v. *Angrove,* 92 Mont. 101, 116, 10 Pac. (2d) 577; *State ex rel. Snidow* v. *State Board of Equalization,* 93 Mont. 19, 17 Pac. (2d) 68; *Nichols* v. *School District,* 87 Mont. 181, 287 Pac. 624; *Putnam* v. *Putnam,* 86 Mont. 135, 282 Pac. 855; *McNair* v. *School District,* 87 Mont. 423, 288 Pac. 188, 69 A. L. R. 866; *Great Northern Utilities Co.* v. *Public Service Commission,* 88 Mont. 180, 293 Pac. 294; *State* v. *Anderson,* 92 Mont. 298, 13 Pac. (2d) 231; *Conley* v. *Conley,* 92 Mont. 425, 15 Pac. (2d) 922; *Campbell* v. *City of Helena,* 92 Mont. 366, 16 Pac. (2d) 1; *Mills* v. *State Board of Equalization,* 97 Mont. 13, 33 Pac. (2d) 563; *State ex rel. Nagle* v. *Leader Co.,* 97 Mont. 586, 37 Pac. (2d) 561; *State ex rel. Nagle* v. *Sullivan,* 98 Mont. 425, 40 Pac. (2d) 995, 99 A. L. R. 321; *Purcell* v. *Davis,* 100 Mont. 480, 50 Pac. (2d) 255; *In re Wilson's Estate,* 102 Mont. 178, 56 Pac. (2d) 733, 105 A. L. R. 367.)

In the *case of Murray Hospital* v. *Angrove,* supra, it was said: "It is the duty of the court to ascertain, if possible, the intention of the legislature in passing an Act and to give effect thereto, and that, under proper circumstances, the court may resort to the history of the bill at the time of its enactment into law, and to the legislative journals of the time for this purpose. (*Lerch* v. *Missoula Brick* [*& Tile*] *Co.,* 45 Mont. 314, 123 Pac. 25, Ann. Cas. 1914A, 346; *Sullivan* v. *City of Butte,* 65 Mont. 495, 211 Pac. 301; *Pennsylvania R. Co.* v. *Interna-*

*tional Coal Mining Co.*, 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; *United States* v. *St. Paul, M. & M. R. Co.*, 247 U. S. 310, 38 Sup. Ct. 525, 528, 62 L. Ed. 1130.) Also, when an amendment is offered ·to a pending bill and rejected, the intention of the legislature is manifest that the law shall not read as it would if the amendment had been accepted, and the courts cannot do 'by construction what the legislature refused to do by amendment.' (*McDonald & Johnson* v. *Southern Express Co.*, C. C., 134 Fed. 282, 288; *United States* v. *United Shoe Machinery Co.*, D. C. 264 Fed. 138, 174, affirmed 258 U..S. 451, 42 Sup. Ct. 363, 66 L. Ed. 708.)''

Citations from the rulings of the Department of Labor of the United States, from the Supreme Court of the United States and other federal courts, as well as numerous decisions from other jurisdictions have been cited to support the contentions of the plaintiffs, but such citations can have no weight in determining the meaning of a provision of the Montana statutes when an obvious particular meaning has been so forcefully and persistently adhered to by the Montana legislature, session after session. We could have no stronger proof of legislative intent. The question involved here is purely a question of construction of a Montana statute by this court, a question over which this court has exclusive jurisdiction; but this court has no right to determine the meaning of section 3071, Revised Codes, or any other statutes, by adopting a meaning in clear conflict with the legislative will. When the legislative department has five times, running over a period of more than a third of a century, refused to amend the statute to express what the plaintiffs now desire this court to say it means, we should deny the relief sought. If the legislature had not indicated its decisive opposition to the meaning the plaintiffs pray this court to give to section 3071, we would be justified in looking to other jurisdictions for counsel and enlightment, but when no doubt is left as to legislative intent, we may not look elsewhere.

It is not to be understood that due consideration should not be given to the rules laid down by courts of other jurisdictions

in the construction of statutes similar to those of Montana. It is only when our own legislative enactments are not clear and no applicable rule has been laid down in this jurisdiction that we are justified in looking abroad.

If the plaintiffs have any right of action against the defendant under any of the rules and regulations of the Department of Labor of the United States, or under the provisions of any statute of the United States, or by reason of any rule laid down by the United States Supreme Court affecting the plaintiffs in regard to the demands made in their complaint, they should seek their remedy in the federal courts. No federal question is involved in our determination of what the Montana legislature meant in enacting section 3071, nor what it meant when at five different sessions it deliberately refused to accede to the demands of labor by enacting an amendment to the section in accord with labor's demand.

On the question that decisions of federal agencies and federal courts are without binding force in the construction of our statutes by our supreme court, it was said in *Knop* v. *Monongahela River etc. Co.,* 211 U. S. 485, 29 Sup. Ct. 188, 189, 53 L. Ed. 294, Mr. Justice Brewer speaking for the court: "The mere construction of a state statute does not of itself present a Federal question."

In *Honover Fire Ins. Co.* v. *Carr,* 272 U. S. 494, 47 Sup. Ct. 179, 183, 71 L. Ed. 372, 49 A. L. R. 713, Mr. Chief Justice Taft, speaking for the court, said: "It is true that the interpretation put upon such a tax law of a state by its Supreme Court is binding upon this court as to its meaning; but it is not true that this court, in accepting the meaning thus given, may not exercise its independent judgment in determining whether, with the meaning given, its effect would not involve a violation of the federal Constitution. * * * *Upon the mere question of construction we are of course concluded by the decision of the state court of last resort.*" Such has been the uniform rule of the Supreme Court of the United States in relation to decisions of the state courts of last resort in construing state statutes from the earliest days of our judicial history.

The conclusions here expressed relative to section 3071 apply as well to section 3079 and to section 4 of Article XVIII of the Constitution.

The judgment should be affirmed.